IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| SARA WHYTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| v. | ) | |
| | ) | _____ |
| NATIONAL BOARD OF | ) | |
| MEDICAL EXAMINERS | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT**

I. INTRODUCTION

In Manzzeo v. Color Resolution Int'l. LLC, 746 F. 3d 1264 (11th Cir. 2014),

the Court applied the ADA Amendment Act of 2008 (the ADAAA) which became

effective on January 1, 2009. As the Court observed at 1269:

> When it enacted the ADAAA, Congress indicated that
> one of its purposes was to "convey that the question of
> whether an individual's impairment is a disability under
> the ADA should not demand extensive analysis." 42
> U.S.C. § 12101 note. The ADA defines the term
> "disability" as (1) a physical or mental impairment that
> "substantially limits one or more" of an individual's
> "major life activities," (2) a "record of such an
> impairment," or (3) "being regarded as having such an
> impairment" as described in subsection (1). 42 U.S.C. §
> 12102(1). Under the ADA, "major life activities include,
> but are not limited to, ... sleeping, walking, standing,
> lifting, ... [and] bending[.]" Id. at § 12102(2)(A).

1

Third, in passing the ADAAA, Congress stated that the Supreme Court's interpretation of the phrase "substantially limits," in cases like <u>Toyota Motor,</u> had "created an inappropriately high level of limitation necessary to obtain coverage under the ADA," and that "the primary object of attention in cases brought under the ADA should be whether entities covered by the ADA have complied with their obligations[.]" 42 U.S.C. § 12101 note. The ADA, therefore, now provides that the phrase "substantially limits" "shall be interpreted consistently with the findings and purposes of the [ADAAA]," <u>id</u>. at § 12102(4)(B), and that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," <u>id</u>. at § 12102(4)(D). And the EEOC, pursuant to its statutory authority to issue regulations implementing the definition of "disability" in the ADA, <u>see id</u>. at § 12205a, has further explained that the phrase "substantially limits" is to be "construed broadly in terms of extensive coverage" and is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). The EEOC's regulations also provide that an "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting;" the phrase "substantially limits" "shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA;" (with the exception of glasses or contact lenses) the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures;" and an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity." <u>Id</u>. at § 1630.2(j)(1)(ii), (iv), (vi)-(vii). [1]

---

[1] Courts have held their regulations apply in a Title III context. <u>E.g.</u> <u>Rawden v. American Board of Pediatrics</u>, 985 F. Supp. 2d 636 (E.D. Pa. 2013), <u>Doe v. Samuel Merritt University</u>, 921 F. Supp. 2d 958 (N.D. Cal. 2013).

This regulation is entitled to great weight, if not controlling weight. United States

v. Board of Trustees for the University of Alabama, 908 F. 2d 740, 744 (11th Cir.

1990). The ADA in particular "has been described as a 'milestone on the path to a

more decent, tolerant, progressive society.'" P.G.A. Tour, Inc. v. Martin, 532 U.S.

671, 675 (2001).

    As Judge Rubin once explained:

> Where the nature of an act is remedial, as here, it should
> be construed liberally in an attempt to provide the
> remedy, not avoid it. See Thomas v. Myers-Dickson
> Furniture Co., 5th Cir. 1973, 479 F. 2d 740.

Starks v. Orleans Motors Inc., 372 F. Supp. 928, 932 (E.D. La. 1974) aff'd. 500 F.

2d 1182 (5th Cir. 1974).

    Judge Goldberg had been, perhaps, more colorful in Thomas:

> Its language should be construed liberally in light of its
> broad remedial purpose….and we will not strain to avoid
> giving effect to the Protection Federal Consumer Credit
> Protection Act.

(Emphasis in original) Compare Raetano v. Kelly Inc., 2009 WL 651 808 (M.D.

Fla. 2009) slip at 2 with Henrietta D. v. Bloomberg, 331 F. 3d 261, 279 (2d Cir.

2003).

> "The Eleventh Circuit, quoting the Fifth Circuit has
> explained that remedial statutes (and thus their
> supporting regulations) are to be construed liberally to
> effectuate their purpose."

3

CFTC v. Hefferman, 245 F. Supp. 2d 1276, 1301 (S.D. Ga. 2003); accord National

Engineering & Contracting Co. v. OSHA, 928 F. 2d 762, 767 (6th Cir. 1991) citing

Whirlpool Corp. v. Marshall, 445 U.S. 1, 13 (1980).

## II. ADHD IS A DISABILITY UNDER THE AMENDED ADA

Although there are cases that hold that ADHD is not a disability under the

ADA, most of such cases were decided before the ADAAA became effective. See

e.g. Weaving v. City of Hillsboro, 763 F. 3d 1106 (9th Cir. 2014) (covering 2006-

2009).

In McCarty v. Marple Tp. Ambulance Corps., 869 F. Supp. 2d 638, 648

(E.D. Pa. 2012), the Court noted:

> ADHD is an impairment within the meaning of the ADA,
> but it only qualifies as a disability under the ADA if it
> "substantially limits one or more [of McCarty's] major
> life activities." 42 U.S.C. § 12102(1); see Love v. Law
> Sch. Admission Council, Inc., 513 F. Supp. 2d 206, 224
> (E.D. Pa. 2007) (citing Rothberg v. LSAC, 300 F. Supp.
> 2d 1093(D. Colo. 2004); Bartlett v. N.Y. State Bd. of
> Law Exam'rs, 2001 WL 930792 (S.D. N.Y. Aug. 15,
> 2001); Price v. Nat'l Bd. of Med. Exam'rs, 966 F. Supp.
> 419 (S.D. W.Va. 1997)). McCarty asserts that the major
> life activities affected by his ADHD are concentrating,
> thinking, and interacting with others. The Third Circuit
> has already held that concentrating and thinking are
> major life activities. See Gagliardo v. Connaught Labs.,
> Inc., 311 F. 3d 565, 569 (3d Cir. 2002) (concentrating);
> Taylor v. Phoenixville Sch. Dist., 184 F. 3d 296, 307
> (thinking).[2]

---

[2] Rothberg was reversed on appeal of the preliminary relief. 102 Fed. Appx. 122
(10th Cir. 2004).

In <u>Pinckney Association of American Medical Colleges</u>, 2007 WL 9698048

(N.D. Ga. 2007), the Court denied summary judgment to defendant where a

medical student suffered from ADHD.

29 C.F.R. § 1630.2[3] defines disability with respect to an individual as:

> (i) A…mental impairment that substantially limits one or
> more of the major life activities of such individual;
>
> (ii) A record of such impairment.

Coverage is established under <u>either</u> of these prongs. <u>Id</u>.

> A "mental Impairment" is
>
> (2) Any mental or psychological disorder such as
> intellectual disability…organic brain syndrome,
> emotional or mental illness, and specific learning
> disabilities.

Major life activities include, but are not limited to…

> learning, reading, concentrating, thinking,
> communicating…

The regulation then concludes:[4]

> **(j)Substantially limits -(1)Rules of construction.** The
> following rules of construction apply when determining
> whether an impairment substantially limits an individual
> in a major life activity:
>
> **(i)** The term "substantially limits" shall be construed
> broadly in favor of expansive coverage, to the maximum

---

[3] A copy of the regulation is attached.

[4] Section (j)(i-v) will be discussed below.

5

extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

**(ii)** An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

**(iii)** The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

**(iv)** The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

**(v)** The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

Some idea of how this is supposed to work out is found in the settlement agreement between the United States of America v. National Bd. of Medical Examiners, DJ# 202-16-181.[5]

According to the verified complaint and affidavit, plaintiff suffers from disabilities which substantially affect her performance on standardized tests. She is substantially limited in the major life activities of concentrating, reading, learning and test-taking. See e.g. Doe, supra at 966, citing Bartlett v. N.Y. State Board of Law Examiners, 970 F. Supp. 1094, 1117 (S.D. N.Y. 1997) aff'd. in part and vacated in part on other grounds 527 U.S. 1031 (1999).[6]

Yet, the National Board of Medical Examiners has denied her request for accommodations as though the 2008 ADA amendments were never passed.

So, the Board still refuses to think of ADHD as a disability, refuses to accept either Bartlett or the EEOC regulations interpreting "substantially limits one or more major life activities compared to most people in the general population."[7]

One might have thought that having entered into a settlement with the Department of Justice, (although concededly the agreement is no longer in force per paragraph 28) that the Board would have changed its practices. For example,

_____

[5] A copy of the agreement appears on the DOJ website and is attached.

[6] Bartlett is cited a number of times in the brief. Plaintiff is referring, however, to 2001 WL 930792 (S.D. N.Y. 2001).

[7] This is almost word for word what the Board was doing to Mr. Rothberg, see paragraph 8 of the agreement.

compare the April 30, 2018 letter ("nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are <u>indicated</u> or will be available in all future settings and circumstances") with paragraph 16.

Earlier the Board had written on October 6, 2016:

> The conclusions of your evaluator notwithstanding, your 2015 performance on a range of cognitive and academic tasks including attention, processing speed, working memory, and timed reading comprehension are well within the range of average functioning and do not demonstrate impairments that limit any major life activity. For example, consistent with your 2009 evaluation, your 2015 Nelson-Denny Reading Test (NDRT) timed reading comprehension was Average range, better than 30% of a national sample of college educated peers. Furthermore, neither you nor your evaluators describe current symptoms of depression, and your evaluators do not discuss how you currently meet diagnostic criteria for any psychiatric disorder.[8]

Note the failure to give any weight to the conclusions of the evaluator despite paragraph 14 of the agreement and <u>Bartlett</u>. In other words, the Board is still making determinations based solely on testing. Moreover, there is no consideration of the steps that plaintiff has taken to self-accommodate herself. Nor is there any reason for the 30% range to be considered. <u>Cf</u>. <u>Bartlett</u>, 970 F. Supp. 1094, 1113-1114.

---

[8] Defendant is referring to the Nelson-Denny Reading Test comprehension rate. Left unstated is that plaintiff's reading rate places her in the bottom 6% of the country, so that she would never get to all the questions on the test.

III. WHOM IS PLAINTIFF TO BE COMPARED WITH

This brings us back to 28 C.F.R. § 1630.2(j).

Subsection (i) requires "expansive coverage, to the maximum extent permitted by the terms of the ADA." In other words, this Court should read this remedial statute as Judge Rubin (affirmed by the Fifth Circuit) did in Starks, supra.

The paragraphs that follow appear inconsistent with each other.

Substitution (ii) says:

An impairment is a disability…if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.

(Emphasis added).

Subsection (iii) says that this is not the primary question, however.

Subsection (iv) emphasizes this point.

The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.

even though

(v)

The comparison of an individual's performance of a major life activity by most people in the general population will not require [certain analysis].

But compare 29 C.F.R. § 1630 app. with Yingling, Disabilities and the ADA: Licensing Exam Accommodations in the Wake of the ADA Amendments of 2008, 59 Cleveland State L. Rev. 291, 309 (2011).

An analysis that requires comparisons with the general population as opposed to plaintiff's peers can only be based on the authority of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) and Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999)—the exact cases that Congress meant to overturn. See Singh v. George Washington University School of Medicine and Health Sciences, 508 F. 3d 1097, 1100-1101 (D.C. Cir. 2007);[9] Accord Wong v. Regents of the University of California, 410 F. 3d 1052, 1065 (9th Cir. 2005).

Jenkins v. National Bd. of Medical Examiners, 2008 WL 410237 (W.D. Ky. 2008), was reversed exactly on this point. 2009 WL 331638 (6th Cir. 2009). See Yingling.

In Singh, supra, the Court of Appeals agreed that the plain text of the ADA "never speaks of making a comparison." 506 F. 3d 1097.

The District Court had said, 368 F. Supp. 2d 58, 65-66 (D. D.C. 2005):

> First, assuming these regulations are valid, these regulations do not require a comparison to the general population in all cases. As for the EEOC regulations,

---

[9] A number of Courts still cite Singh and Wong despite this. Rawdin v. American Bd. of Pediatrics, 985 F. Supp. 2d 636 (E.D. Pa. 2013); Rumbin v. Ass'n. of Am. Med. Colls., 803 F. Supp. 2d 83, 85 (D. Conn. 2011); Bibber v. National Bd. of Osteopathic Medical Examiners, Inc., 2016 WL 1404157 (E.D. Pa. 2016).

quite clearly, when an ADA plaintiff claims a limitation in the major life activity of working, her limitation is assessed in comparison to others of comparable training, skills, and abilities. It is not surprising that the EEOC, concerned with employment practices and empowered by Congress to issue some ADA interpretive regulations in the employment context, see 42 U.S.C. § 12116, would offer a more particular and detailed definition of "substantially limits" with respect to working while devising a more generalized definition for other activities. For many of the other listed activities, a person's training, skills, and abilities are far less relevant to assessing whether that person is substantially limited in that activity. See Duncan v. WMATA, 240 F. 3d 1110, 1121–22 (D.C. Cir. 2001) (en banc) (Edwards, C.J., dissenting). But see Wong v. Regents of the U. of Cal., 379 F. 3d 1097, 1108 (9th Cir. 2004) (importing, without convincing analysis, the "entire population" comparison requirement from the physical disability context to deny relief to a learning-impaired medical student dismissed after receiving poor grades, discovering his impairment, and requesting accommodations). For example, whether a blind or deaf or paraplegic person has a college degree is of no moment to assessing whether she is substantially limited as to seeing, hearing, or walking. In this respect, learning is more like working than other major life activities. When learning, a person always finds herself amongst people with similar academic background. In pre-school, children have almost no prior educational training. At graduate school, at medical school, every student has a degree from a four-year college. Students are generally compared to their peers on examinations, and that is how their substantial success or limitation in learning is measured. Cf. Bartlett, 970 F. Supp. at 1126 (comparing plaintiff seeking bar exam accommodations to fellow law students when concluding that she is substantially impaired in activity of working as a lawyer). Defendants would compare plaintiff, a graduate medical student, to a high school graduate or perhaps even a pre-

11

school student to determine whether she is substantially limited in her ability to learn. They would apply the general definition of "substantially limits" when the more specific definition, that for working which accounts for a person's training, is more applicable. Using a more specific definition makes sense. The EEOC regulations, therefore, do not require a plaintiff to show that she is substantially limited in learning compared to the rest of the world, but as compared to people of similar age and educational background. The Department of Justice regulation is not at all inconsistent, advising that a comparison be made to "most people." Most people is by no means all people, and the language's ambiguity would permit the agency or other entity to shape the appropriate comparison given the circumstance.

In Bartlett v. N.Y. State Bd. of Law Examiners, 2001 WL 930792 (S.D. N.Y. 2001), Justice Sotomayor, then a Circuit Judge sitting by designation, noted that the comparison to the average person in the general population could not be based on test score alone[10] or on plaintiff's ability "to self-accommodate." She concluded (at slip 3):

> that when considering both the positive and negative effects of plaintiff's self-accommodations, plaintiff is substantially limited in the major life activity of reading when compared to the average reader by her slow reading rate and by the fatigue caused by her inability to read with automaticity.

She further noted at 22:

_____

[10] "All of the experts, including defendant's experts, agree that no psychometric tests directly measure automaticity." Nor do such tests properly diagnose "reading rate problems." Id. at 22. Such tests are also "extremely limited in their applications to adults." Id.

> Plaintiff's experts have convinced me… that learning
> disabilities cannot be captured by psychometric measures
> alone and that clinical observations are essential to a
> diagnosis of learning disabilities.

And she concluded that plaintiff's reading disability "substantially limit[ed]

her major life activity of reading." Id. at 29[11] citing inter alia Root v. Ga. State Bd.

of Veterinary Med., 114 F. Supp. 2d 1324 (N.D. Ga. 2000), reversed in part,

vacated in part on other grounds, 252 F. 3d 443 (11th Cir. 2001)[12] (distinguishing

between measures that improved abilities to overcome disabilities and other

disabilities). In doing so, id. at 35, the Court noted the requirements of

distinguishing "between the mitigating measures plaintiff uses that affect her

ability to read and those that merely assist her in functioning in her daily life."

She concluded

> in order to find that plaintiff has a reading disability, I
> must find that she is substantially limited in reading in
> comparison to "most people." 28 C.F.R. Pt. 35, App. A §
> 35.104. Dr. Flanagan contends that "most people" should
> be defined in reference to a bell curve on standardized
> tests. Specifically, she testified that individuals can only
> be substantially limited when compared to "most people"
> if their scores fall outside the average range of the 16th to
> 84th percentiles. (Flanagan Aff. ¶ 9(a)(i); Tr. at 616 .)
> While I have already rejected the proposition that
> plaintiff's disability can be diagnosed solely on her scores
> outcome on tests without reference to the manner in
> which she achieved those outcomes, see
> supra, Conclusions of Law, Section I.B., I also disagree

---

[11] Note that she is relying on the restrictive ADA readings of Sutton et al.
[12] See Bartlett at fn. 41.

13

with Dr. Flanagan that, to the extent that such test scores
are relevant, I should equate "most people" with the
average range on the bell curve. While the DOJ has not
specifically defined the term "most people," I find the
EEOC's discussion of this term to be instructive:
[A]n impairment is substantially limiting if it
significantly restricts the duration, manner or condition
under which an individual can perform a particular major
life activity as compared to the average person in the
general population's ability to perform that same major
life activity .... It should be noted that the term "average
person" is not intended to imply a precise mathematical
"average." 29 C.F.R. Pt. 1630, App. A § 1630.2(j)

In Yingling, supra, the author at 306 noted the views of the House

Committee on Education and Labor on the ADAAA.

it is critical to reject the assumption that an individual
who performs well academically or otherwise cannot be
substantially limited in activities such as learning,
reading, thinking or speaking.

Moreover, the Committee endorsed Bartlett's holding "that a determination

of whether a plaintiff is substantially limited should not take into consideration the

plaintiff's ability to self-accommodate. As he noted at 307:

The courts can bring case law in step with intentions of
Congress and also clarify standards for examination
boards by addressing future claims in a slightly different
manner than in the past. This article makes three primary
recommendations for future decisions regarding licensing
exam accommodations for learning disabilities: (1) the
courts should no longer foreclose the finding of a
substantially limiting impairment in regard to the major
life activity of reading due to an individual's academic
success; (2) "working" should be recognized as an
appropriate major life activity under which to evaluate

14

claims for accommodations on the bar exam (and
possibly other licensing exams), with such evaluations
involving a comparison to people having comparable
training, skills, and ability; and (3) reading disabilities
should be recognized not only by psychometric test that
show a substantial limitation in comparison to most
people, but also by test scores that indicate a significant
discrepancy between an individual's intellectual capacity
and actual reading ability. By following these
recommendations, the courts will be able to evaluate
future claims for accommodations on licensing exams
with standards that reflect Congress' intention to provide
a broad scope of protection under the ADA.

However, the proper test is phrased, Ms. Whyte clearly meets it.

## IV. PLAINTIFF IS ENTITLED TO A TRO

### A. The Standards

The standards for a temporary restraining order are the same as for a

preliminary injunction, See City of Eufaula v. Alabama DOT, 2014 WL 7369783

(M.D. Ala. 2014); O'Boyle v. Town of Gulf Stream, 2013 WL 3147639 (S.D. Fla.

2013); Florence v. Donald, 2007 WL 1033523 (S.D. Ga. 2007) citing Bieros v.

Nicola, 857 F. Supp. 445, 446 (E.D. Pa. 1994); Johnson v. Patterson, 2012 WL

353238 (S.D. Ala. 2012) fn. 1.

The appropriate standards are set out in Texas v. Seatrain International, 518

F. 2d 175, 179-180 (5th Cir. 1975);

As we said in Canal Authority of State of Florida v.
Callaway, 489 F. 2d 567 (5th Cir. 1974), it is an
extraordinary and drastic remedy which should not be
granted unless the movant has clearly carried the burden

15

of persuasion concerning the existence and application of
what we have recognized as the four prerequisites to such
relief. These are: (1) a substantial likelihood that the
movant will eventually prevail on the merits; (2) a
showing that the movant will suffer irreparable injury
unless the injunction issues; (3) proof that the threatened
injury to the movant outweighs whatever damage the
proposed injunction may cause the party or parties
opposed; and (4) a showing that the injunction, if issued,
would not be adverse to the public interest. Canal
Authority, supra, 489 F. 2d at 572; Di Giorgio v. Causey,
488 F. 2d 527 (5th Cir. 1973); Blackshear Residents
Organization v. Romney, 572 F. 2d 1197 (5th Cir. 1973);
Allison v. Froehlke, 470 F. 2d 1123 (5th Cir. 1972).

No matter how severe and irreparable an injury one
seeking a preliminary injunction may suffer in its
absence, the injunction should never issue if there is no
chance that the movant will eventually prevail on the
merits. Nor is there need to weigh the relative hardships
which a preliminary injunction or the lack of one might
cause the parties unless the movant can show some
likelihood of ultimate success. Obviously, it is
inequitable to temporarily enjoin a party from
undertaking activity which he has a clear right to pursue.
However, one appealing to the conscience of the
chancellor to maintain the status quo pending final
decision, although he carries a burden, is not required to
prove to a moral certainty that his is the only correct
position. The prerequisite, as an absolute, is more
negative than positive: one cannot obtain a preliminary
injunction if he clearly will not prevail on the merits;
however, that he is unable, in an abbreviated proceeding,
to prove with certainty eventual success does not
foreclose the possibility that temporary restraint may be
appropriate. In its negative sense, the factor is critical;
but viewed positively, the importance and nature of the
requirement can vary significantly, depending upon the
magnitude of the injury which would be suffered by the
movant in the absence of interlocutory relief and the

relative balance of the threatened hardship faced by each of the parties. Canal Authority, supra. This is so because, as we have noted, none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus. Siff v. State Democratic Executive Committee, 500 F. 2d 107 (5th Cir. 1974).

### B. Plaintiff Is Entitled To A TRO

It is true that there are a number of cases prior to the ADA amendments of 2008 that denied a TRO, but as argued above, the 2008 amendments have completely changed the legal landscape.[13]

Nevertheless, there was, and is, a substantial body of case law granting such relief. See Rush v. National Bd. of Medical Examiners, 268 F. Supp. 2d 673 (N.D. Tex. 2003) (granting preliminary injunction); Agranoff v. Law School Admissions Council, Inc., 97 F. Supp. 2d 86 (D. Mass. 1999); Badgley v. Law School Admissions Council, Inc., WL 33224318 (N.D. Tex. 2000). See also Bonnette v. District of Columbia Court of Appeals, 796 F. Supp. 2d 164 (D. D.C. 2011), Jones v. National Conference of Bar Examiners, 801 F. Supp. 2d 270 (D. Vt. 2011).

---

[13] See Rothberg v. Law School Admissions Council, 102 Fed. Appx. 122 (10th Cir. 2004) reversing 300 F. Supp. 2d 1093 (D. Colo. 2004). Unlike Rothberg however, plaintiff can show such harm. If she is not allowed to take the upcoming USMLE and pass, she will not be able to continue her medical education.

C. Plaintiff Will Suffer Irreparable Injury Which Outweighs

The Possible Harm To Defendant

In <u>Alejandro v. Palm Beach State College</u>, 843 F. Supp. 2d 1263 (S.D. Fla.

2012), the Court granted a temporary injunction requiring defendant to allow

plaintiff to bring her "psychiatric service dog to mitigate the symptoms of her

mental disabilities." As the Court noted in words that are appropriate in this case at

1270-1271:

> Since attending class an important aspect of obtaining a
> degree, this Court believes that plaintiff will suffer
> irreparable harm if the requested injunctive relief is not
> granted.

If plaintiff does not pass Step 2 of the USMLE, she will no longer be

enrolled and will not obtain a degree. The question, then, is whether plaintiff

should be allowed her right to try to pass that test on a level playing field.

In <u>Rush</u>, the Court relied on law still controlling in this Circuit:

> The USMLE Step I examination involves and requires
> extensive reading, and scoring well and/or passage of the
> exam requires extensive subject-matter knowledge.
> Plaintiff has shown a sufficient causal connection
> between his reading impairment and his failures to score
> well, or as well as he might, on time-limited
> examinations requiring extensive reading. Plaintiff has
> shown that if he is accommodated will he be effectively
> tested not on his disability but rather on his subject-
> matter knowledge. Plaintiff has shown that his reading
> impairment seriously decreases the rate at which he reads
> with comprehension. Plaintiff will suffer irreparable
> injury if the requested injunction is denied.

18

With the requested reasonable accommodation of double time to take the Step I exam, Plaintiff will have time to either display his mastery of the subject matter, or show that he has not sufficiently mastered the tested materials. In either event, granting the injunction will allow Plaintiff to be tested on his medical and science knowledge and not his disability.

The threatened injury to Plaintiff outweighs any damage that granting the preliminary injunction might cause at this time to the Defendant or to the public.

The injunction will not disserve the public interest but will further the public interest in prohibiting discrimination by public entities, such as the National Board of Medical Examiners, on the basis of disability by fulfilling the ADA's requirement that entities offering licensing examinations provide reasonable accommodations to disabled individuals.

## V. CONCLUSION

Plaintiff respectfully requests that a TRO be issued.

Respectfully submitted,

/s/ Ralph Goldberg
Ralph Goldberg
Georgia Bar No. 299475

/s/ Laurene Cuvillier
Laurene Cuvillier
Georgia Bar No. 202922
Attorneys for Plaintiff

Goldberg & Cuvillier, P.C.
1400 Montreal Road, Suite 100
Tucker, Georgia 30084-6919
(770) 670-7343
(770) 670-7344 (FAX)
attorneygoldberg@hotmail.com