IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| **SARA WHYTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-00062-CAR** |
| | ) | |
| **NATIONAL BOARD OF MEDICAL EXAMINERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## NBME'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Sara Whyte is in medical school.  She was admitted after obtaining exceptional scores on the Medical College Admission Test ("MCAT"), which is an extremely difficult multiple-choice examination, containing lengthy reading passages and taken under fixed time constraints.  Ms. Whyte took the MCAT without extra testing time.

To become a licensed physician, Ms. Whyte must pass four examinations that comprise the United States Medical Licensing Examination, or "USMLE."  She has already passed two parts of USMLE, without extra time or any other accommodations.  Nevertheless, to help her pass her next USMLE exam, Ms. Whyte is asking the Court -- by way of a "temporary" restraining order -- to require the National Board of Medical Examiners ("NBME") to allow her to test with 50% more testing time than other examinees receive, and to provide her with additional accommodations.   Her motion seeks a *mandatory* injunction that would give her all the substantive relief to which she would otherwise be entitled only if she were to prevail on the

merits of her claim.  NBME respectfully urges the Court to deny the motion. Ms. Whyte has not

shown that she that she is entitled to such extraordinary relief.

## NATURE OF THE CASE

Ms. Whyte has been diagnosed as having an Attention Deficit Hyperactivity Disorder

("ADHD").   Complaint ¶¶ 13, 14, 23 (ECF No. 1).   Relying upon this diagnosis, she claims to

be disabled under the Americans with Disabilities Act ("ADA") and entitled to extra testing time

and other accommodations on the USMLE.  *Id.* at ¶¶ 44-50.

To prevail, Ms. Whyte must demonstrate that she is disabled within the meaning of the

ADA and needs reasonable accommodations to take the USMLE in an accessible manner.  *See*

42 U.S.C. § 12189.   An individual is disabled under the ADA if she has an impairment that

substantially limits her ability to perform one or more major life activities, as ***compared to most***

***people in the general population***.  42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v).

NBME denies that Ms. Whyte is entitled to accommodations.  In the first place, there is a

question whether her ADHD diagnosis meets the applicable diagnostic criteria.[1]  ADHD is a

lifelong impairment with childhood onset and must affect an individual across multiple settings

(*e.g.*, social, academic, and employment).  Ms. Whyte, however, was not diagnosed with ADHD

---

[1] The core symptoms of ADHD "are also core symptoms of human nature. Everyone is prone toward some degree of inattentiveness and impulsiveness."  M. Gordon, *Attention Deficit Hyperactivity Disorder (ADHD) and Test Accommodations*, The Bar Examiner, Vol. 67, No. 4, at 26 (Nov. 1998). As a result, ADHD is frequently misdiagnosed. *See, e.g.,* J. Joy, "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations for the National Board of Osteopathic Medical Examiners COMLEX Exam," 14(2) J. of Attention Deficit Disorders 104, 106 (2010) (discussing results of an independent professional review of requests for testing accommodations from 50 individuals who claimed to have ADHD:  of the 50 files reviewed, "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD").

as a child (the diagnosis relied on here was made at age 33), and she presented no documentation to NBME which reflected significant difficulties with academics, relationships or employment.

Further, even if one accepts Ms. Whyte's ADHD diagnosis, her documentation does not support a finding that she is substantially limited in any major life activities as compared to most people in the general population. To the contrary, she has already passed two of the USMLE exams with no accommodations; she has done very well on other demanding, timed, standardized tests without accommodations; she did well enough in high school to be a Hope Scholar (receiving accommodations, if at all, late in her high school career) and made the Dean's List "every year at Georgia Tech," http://medicalpartnership.usg.edu/?/directory/students/whyte-sara; and she obtained a Master of Public Health graduate degree from Emory University, *id*. She is not substantially limited in any major life activity as compared to most people in the general population.

## **BACKGROUND**

### I.     NBME and the USMLE

NBME is a not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality examinations. Decl. of Catherine Farmer ¶ 3 ("Farmer Decl."). In conjunction with the Federation of State Medical Boards, NBME sponsors the USMLE program. *Id*. ¶ 4.

The USMLE is a standardized examination[2] used to evaluate applicants' competence for medical licensure. *Id*. ¶ 4. It is designed to assess an examinee's ability to apply knowledge,

---

[2] "When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. Without such standardization, the accuracy and comparability of score interpretations would be reduced. For tests designed to assess the test taker's knowledge, skills, abilities, or other personal characteristics, standardization helps to

concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.  *Id.*  Licensing authorities across the United States rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine. *Id.* ¶ 5.

Three "Step" exams make up the USMLE, taken at different times in an individual's graduate medical education process: Step 1, Step 2 (consisting of the Step 2 Clinical Knowledge exam (Step 2 CK) and the Step 2 Clinical Skills exam (Step 2 CS)), and Step 3.  *Id.* ¶ 6.

Step 1 assesses whether candidates understand and can apply important science concepts that are basic to the practice of medicine. *Id.*  Under standard conditions, Step 1 is a one-day, eight-hour multiple-choice examination.  *Id.* Ms. Whyte took the Step 1 exam twice, with no accommodations, and achieved a passing score on her second try.  *Id.* ¶¶ 15, 16.

Step 2 assesses whether candidates can apply medical knowledge, skills, and understanding of clinical science essential for the provision of care under supervision and includes emphasis on health promotion and disease prevention.  Step 2 CS uses standardized patients to test students and graduates on their ability to gather information from patients, perform physical examinations, and communicate their findings to patients and colleagues.  *Id.* ¶ 6. Ms. Whyte passed the Step 2 CS exam without extra testing time or other accommodations. *Id.* ¶ 22.  This lawsuit involves the Step 2 CK exam.  Like Step 1, which Ms. Whyte has already passed, Step 2 CK is a one-day, computer-based, multiple-choice examination.  *Id.* ¶ 6.

Examinees take the USMLE under standard conditions, including standard time.  NBME provides accommodations, however, to individuals who have a disability within the meaning of

---

ensure that all test takers have the same opportunity to demonstrate their competencies." *Standards for Educational & Psychological Testing* at 111 (2014).

the ADA. *Id.* ¶ 9. In all instances, NBME's objective is to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage…. As administrator of the national exam used by . . . states for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking it." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004) (rejecting ADA claims brought by an examinee against NBME and her medical school). NBME also has a duty to protect the integrity of USMLE scores, given the USMLE's role in helping jurisdictions ensure the minimum competency of licensed physicians.

## II.     Ms. Whyte's Request for Accommodations on the USMLE

Ms. Whyte requested accommodations on the Step 1 exam, as well as on Step 2 CK. *See* Farmer Decl. ¶¶ 11, 17-19, 26, Exs. A, G and N. Based on input that it received from independent external professionals who reviewed all of her supporting documentation and its own review, NBME concluded that Ms. Whyte had not shown that she has a disability that warrants extra testing time or other accommodations. *Id.* ¶¶ 13-4, 20-21, 24, 27. NBME informed Ms. Whyte of its decisions regarding the Step 2 CK exam in letters dated October 6, 2016, November 1, 2017, and April 30, 2018. *Id.* at ¶¶ 21, 24, Exs. I, L and O.

## III.    Ms. Whyte's Current Status in Medical School

According to Ms. Whyte, she "is presently enrolled in the Augusta University/UGA Medical Partnership." Complaint ¶ 6. She matriculated in 2012.

### III.    Ms. Whyte's Academic and Testing History

### A.    <u>Primary School and High School</u>

Ms. Whyte provided no academic records to NBME that suggested that she experienced poor academic performance, reading deficiencies, or learning or attentional issues in elementary school or middle school.

Ms. Whyte's grades in high school were generally in the A and B range.  The comments from her teachers on her report cards were all positive and, although codes were available to identify inattentive or disruptive behavior, her teachers never identified such behavior and instead described her as a "pleasure to teach."  *See* Farmer Decl. ¶ 31, Ex. T.

In her first two USMLE accommodation request forms, Ms. Whyte stated that she received accommodations every year in high school, from 1996-2000.  *See* Farmer Decl. ¶¶ 11, 17, Exs. A (at 6) and G (at 6).  However, in her third accommodation request form, she stated that she only receive accommodations between 1998 and 2000.  ¶ 26, Ex. N.  Based upon a document she has submitted to the Court, it appears that Ms. Whyte first requested accommodations mid-year in the 11th grade.  According to the Minutes from a meeting between school officials and Ms. Whyte's mother, the high school agreed to put a "504 accommodation plan" in place shortly before Ms. Whyte would be taking the SAT college admissions test, so that Ms. Whyte could obtain "additional time in testing situations."  *See* Student Support Team Minutes (1/14/1999) (submitted by Ms. Whyte to the Court).

### B.    <u>College and Graduate School</u>

Ms. Whyte attended Georgia Tech University and, as noted above, she made Dean's List every semester.  She graduated with Honors with a degree in Applied Biology and a 3.33 GPA.

*See* Farmer Decl., ¶ 32, Ex. T.  It is unclear whether she received classroom accommodations at Georgia Tech, but Ms. Whyte has stated that she did.

Before attending medical school, Ms. Whyte completed a graduate school program at Emory University, where she received a Master of Public Health.  Ms. Whyte stated on one of her USMLE accommodation request forms that she received accommodations at Emory, but she did not include Emory on two other forms when asked to identify undergraduate, graduate and professional schools where she received accommodations.  *See* Farmer Decl. Exs. A, G and N.

   **C.**    **Standardized Testing History**

Ms. Whyte took the Georgia High School Graduation Test and scored at or above the 88th percentile in all areas tested, and in the 97th percentile on the assessment that evaluated Reading/Literature, Critical Thinking, and Language/Writing.  *See* Farmer Decl. ¶ 30, Ex. R.  It is not known whether she received accommodations on those tests.

Ms. Whyte took the SAT twice.  Both administrations were "non-standard," but her score reports do not disclose what accommodations she received.  *See* Farmer Decl. ¶ 29, Ex. Q.  Her verbal score was in the 57th percentile nationally when she first tested but improved significantly the second time, to the 86th percentile.  *Id.*

To gain admission to Emory University's graduate school program, Ms. Whyte had to take the Graduate Record Examination ("GRE").  She took the GRE in 2006 without any testing accommodations.  *See* Farmer Decl. ¶ 26, Ex. N (at 4). Like the MCAT, the GRE is a demanding, multiple-choice exam, taken by individuals with a college education or better, and requiring attention, concentration and reading ability in excess of that seen in the general population.  Her GRE scores were apparently good enough to gain admission to Emory

University.  *See*  https://www.sph.emory.edu/admissions/master/index.html  (suggesting that Emory requires GRE scores in the "50th percentile or higher").

Ms. Whyte took the Medical College Admission Test twice, without extra testing time or other accommodations.  She scored in the 19th-23rd percentile the first time she tested, and in the **79th-84th percentile** the second time, which means she was in the top 20% of all individuals who took that demanding examination when she did.  *See* Farmer Decl. ¶ 12, Ex. B.

## IV.  Ms. Whyte's ADHD Diagnoses

Ms. Whyte has submitted two evaluation reports to the Court in support of her TRO request (submitted with a motion to file under seal), as well as a "Statement Under Penalty of Perjury" from a Dr. David Raque (ECF No. 1-3).

The first report is from The Behavioral Institute of Atlanta ("BIA Report").  It was prepared in 1988, when Ms. Whyte was 6 years old, and provides no support whatsoever for the requested TRO.  The report noted that Ms. Whyte exhibited "anxiety," "regressive behavior patterns" and "signs of processing problems," but ultimately concluded that these could simply be "developmental problems" rather than "signs of learning disabilities."  BIA Report at 7.  No diagnosis was made in this report.

The second report was prepared in 2015 by the University of Georgia Regents' Center for Learning Disorders, when Ms. Whyte was 33 years old ("UGA Report").  Ms. Whyte went to the Center for the purpose of establishing her eligibility for "academic accommodations."  UGA Report at 2.  The report reflects two diagnoses: "Attention-Deficit/Hyperactivity Disorder, inattentive type (DSM-5, 314.00)," and "Major Depressive Disorder, mild (DSM-5, 296.31)."  *Id.* at 1. The ADHD diagnosis relied heavily on self-report from Ms. Whyte and her husband, and symptom "checklists" completed by Ms. Whyte and her mother.  *Id.* at 2-5.  In addition, Ms.

Whyte was administered a computerized test of sustained attention; this test "did not suggest impairment," but the evaluators theorized that this "may" have been due to the fact that she was taking ADHD medication at the time, or perhaps by the fact that she was assessed in a "low-distraction setting." *Id.* at 5.

The UGA Report noted that Ms. Whyte had previously been diagnosed with a learning disorder.  However, the 2015 evaluation concluded that she "no longer meets criteria for a learning disorder diagnosis." *Id.* at 3. Importantly, the Report notes that, "**[r]*elative to the general population*,** Ms. Whyte's basic reading decoding … fell well within the ***average*** range," and her overall test results reflected a "pattern of ***generally average basic reading and writing abilities.***" *Id.* (emphasis added).  Her "reading efficiency" was noted as a "relative" weakness, but this was relative to her "superior overall verbal ability." *Id.* at 7.  The "basic reading skills tests" that she was administered did **not** reflect "academic underachievement as compared to the general population." *Id.* at 8.

Dr. Racque had not been in touch with Ms. Whyte "for over ten years" until she contacted him about this case. Statement at 2 (ECF No. 1-3).  He therefore has no personal knowledge regarding whether she has any current functional limitations, and he offers no opinion on whether she is substantially limited in any major life activity compared to most people in the general population.   He suggests that he had diagnosed Ms. Whyte as having "substantial learning disabilities," *id.* at 3, but the UGA Report rejects any such diagnosis and Ms. Whyte herself does not argue that she is entitled to accommodations because of learning disabilities.

## V.    The Diagnostic Criteria for ADHD

The Diagnostic and Statistical Manual of Mental Disorders ("DSM") is commonly relied upon as the authoritative source for the diagnostic criteria for mental impairments. *See, e.g., U.S.*

*v. Long*, 562 F.3d 325, 334 n.22 (5th Cir. 2009).   The current edition, DSM-5, describes the "essential" diagnostic feature of ADHD as "a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development," beginning in childhood and with "[s]everal inattentive or hyperactive-impulsive symptoms … present prior to age 12" and "[m]anifestations of the disorder present in more than one setting (*e.g.*, home and school, work." DSM-5 at 59-61 (2013).

## ARGUMENT

### I.   GOVERNING LEGAL STANDARD

The standard for a TRO is the same as for a preliminary injunction.  "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carriers the burden of persuasion' as to the four prerequisites." *Zardui-Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir. 1985) (citations omitted).  A plaintiff must make a "clear showing" that she is likely to succeed on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest.   *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 20, 22 (2008).   If a plaintiff fails to satisfy any of these factors, the preliminary injunction must be denied.  *Id.* at 22.

The burden is even higher where the plaintiff seeks a mandatory preliminary injunction, as here. "'Mandatory preliminary relief, which goes well beyond simply maintaining the status quo, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.'"  *Powers v. Dep't of Corrections*, 691 Fed. App'x 581, 583 (11th Cir. 2017) (citation omitted).

Ms. Whyte has not satisfied these demanding standards.

## II.   MS. WHYTE IS NOT LIKELY TO SUCCEED ON THE MERITS

Ms. Whyte has been diagnosed with ADHD.  Her diagnosis is subject to question, however, and her supporting evidence does not establish that she is substantially limited in any of her claimed major life activities as compared to the general population.  As discussed below, she effectively concedes the latter point by arguing that the Court should compare her to her peers and not to the general population.

### A.   Disability Under the ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population.

Section 12189 of the ADA provides in relevant part as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.  Pursuant to Section 12819, persons who qualify as disabled under the ADA are entitled to reasonable accommodations during test-taking.

Having a diagnosed impairment, however, is not the same thing as being disabled within the meaning of the ADA.  To be disabled under the ADA, a person must have a "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1), "as compared to most people in the general population."  28 C.F.R. § 36.105(d)(1)(v). If a diagnosis is unwarranted, or if an impairment does not result in substantial limitations, the individual is not disabled under the ADA and is not entitled to accommodations.

Ms. Whyte argues that, in determining whether she is disabled, the Court should compare her to her "peers," not to "the general population."  TRO Br. 10. She is clearly mistaken, however. Her claimed limitations must be measured against most people in the general

population, not against other college graduates or other medical students.  *See Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007).   Contrary to what Ms. Whyte argues, TRO Br. 10, the ADA Amendments Act did not change the relevant comparison group.  *See Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d 1247, 1249-50 (M.D. Fla. 2017) ("Although Black insists that the Board must compare Black's performance to her 'medical-school peers,' under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination depends on a person's performance in comparison to 'most people in the general population.'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 U.S. Dist. LEXIS 48181, *18 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (plaintiff not disabled within the meaning of the ADA, notwithstanding her dyslexia diagnosis, and therefore was not entitled to extra testing time on a medical licensing exam).[3]

### B.   Ms. Whyte Is Not Disabled Within the Meaning of the ADA

Here, there is reason to question whether Ms. Whyte meets the DSM diagnostic criteria for ADHD. There is no credible evidence of childhood onset, no persuasive evidence of impairment across multiple domains (academic, social, and vocational), and no persuasive

---

[3] *See also Bach v. Law Sch. Adm. Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) (examinee with ADHD diagnosis needed to be compared "to the general population"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013) (comparison group is "the general population"), *aff'd*, 582 Fed. App'x 114 (3d Cir. 2014) (judgment for defendant); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population.") (judgment for defendant); *Love v. Law Sch. Adm. Council*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) (plaintiff with LD and ADHD diagnoses not disabled under the ADA and thus not entitled to testing accommodations).

evidence of pervasive functional impairment in her daily living.  *See generally* Farmer Decl. ¶¶ 13, 20, Exs. C at 6-7, H at 2-3.

However, even if the Court were to accept her diagnosis, a diagnosed impairment is not enough to establish a disability under the ADA.  "[T]he other half of the definition requires that the impairment substantially limit one or more major life activities."  *Collado v. UPS*, 419 F.3d 1143, 1155 (11th Cir. 2005); *see also Malone v. Dep't of the Air Force*, 2016 U.S. Dist. LEXIS 39345, *20 (M.D. Ala. 2016) ("The mere fact that Malone may have been diagnosed with ADD is insufficient under the [ADA] to establish that her impairment rises to the level of a disability.") (summary judgment for employer).  Ms. Whyte must show that her alleged ADHD substantially limits her ability to read or concentrate when taking a standardized test like the Step 2 CK exam, as compared to most people in the general population.[4]

Referencing her performance in 2015 on the Nelson Denny Reading Test, Ms. Whyte asserts that her ADHD results in a "reading rate ... in the bottom 6% of the country."  TRO Br. at 8 n.8 (ECF No. 2).  However, she misstates the meaning of her performance on the Nelson Denny, as does Dr. David Raque in the statement he submitted in support of Ms. Whyte.  *See* Statement Under Penalty of Perjury at 5 (ECF No. 1-3) ("In the latest assessment by Dr. Miller what stands out is Sara's scores on the Nelson Denny Reading Test.  Sara's results placed her within the 6% tile ... when   compared to the general population.").  The report by Dr. Miller stated that the Nelson Denny is normed to college students.  UGA Report at 7 (submitted to the

---

[4]  Ms. Whyte asserts that she is "also impaired in the major life activity of testing," and learning. Complaint ¶ 40.  Test-taking is not a separate major life activity, however, and, even if it were, her performance on other standardized tests forecloses a finding that she is substantially limited in her ability to take tests as compared to most people in the general population.  Learning is a major life activity, but it is not an activity that is relevant to whether one can take a standardized test under standard testing conditions.

Court by Ms. Whyte).  It is **not normed** to the "general population" or to "the country."  As Dr. Miller noted, Ms. Whyte's overall evaluation results indicated that she has "generally average basic reading and writing abilities," when compared to the "general population." *Id*. at 3, 8.[5]

Further, Ms. Whyte's unaccommodated performance on the MCAT, GRE, USMLE Step 1 and USMLE Step 2 CS exams precludes any finding that she is substantially limited in any major life activity relevant to taking a standardized test as compared to most people in the general population.  At a minimum, it raises sufficient doubt regarding her likelihood of success to foreclose the entry of a mandatory preliminary injunction that would effectively end this lawsuit at the trial court level, less than a week after it was filed.

Individuals who perform at the level that Ms. Whyte has performed, academically and on other standardized tests that require concentration and extensive reading -- with no extra testing time or other accommodations – are not disabled within the meaning of the ADA.  *See, e.g., Black v. Nat'l Bd. of Med. Exam'rs,* 281 F. Supp. 3d at 1251 ("[O]n a second sitting Black scored better than 73% of MCAT test-takers despite receiving no additional time.  Black's success on the MCAT counsels strongly against the claim that ADHD substantially impairs Black's ability to succeed on a timed and standardized examination.") (also noting plaintiff's other academic accomplishments); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 U.S. Dist. LEXIS 48181 at *25 (individual who scored in the 71st percentile on the GRE and in the "average" range on the reading section of the MCAT without accommodations was not substantially

_____

[5] *See also Bartlett v. N.Y. Bd. of Law Exam'rs*, 226 F.3d 69, 81-82 (2d Cir. 2000) (remanding for a determination of whether plaintiff was substantially limited in comparison to most people, and discounting plaintiff's performance on the Nelson Denny Reading Test as "of limited value, because the proper reference group is 'most people,' not college freshman").  The Nelson Denny reading rate task is "based on only one minute of silent reading with no check on comprehension, and the score that it generates is known to be unreliable.  It should never be used for diagnostic purposes." *See* Farmer Decl. ¶ 20, Ex. H at 2 n.3 (Report of Dr. Benjamin J. Lovett).

limited compared to most people in reading); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Rumbin v. Ass'n of American Med. Colleges*, 803 F. Supp. 2d at 95 (noting plaintiff's "prior education and test-taking without accommodations" in holding that that he was "not substantially limited in the major life activities of seeing, learning, and reading"); *Love v. Law Sch. Adm. Council,* 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (holding that plaintiff had not shown that he was disabled under the ADA and denying testing accommodations on the LSAT, where plaintiff had ACT and SAT scores "within the average range" with no accommodations and a 3.16 high school GPA, and did well in college without accommodations); *cf. Hetherington v. Wal-Mart, Inc.*, 511 Fed. App'x 909, 912 (11th Cir. 2013) (plaintiff was not substantially limited in his ability to think, learn, or read, where he was able to read "at a junior high level" and had "completed 12 years of school") (affirming summary judgment for defendant); *Simpson v. Alabama Dep't of Human Resources*, 311 Fed. App'x 264 (11th Cir. 2009) (affirming summary judgment for defendant based on finding that, in light of plaintiff's "past academic success," plaintiff's diagnosed impairments -- ADHD and learning disabilities -- did not substantially limit his ability to learn, despite evidence that plaintiff's assessment scores showed that his "'processing speed' limits him," and evidence that "doctors, counselors, and other evaluators all considered these test results and diagnosed him with a disability which substantially limits his ability to learn").

Ms. Whyte argues that Congress intended to broaden the coverage of the ADA when it enacted the ADA Amendments Act of 2008 ("ADAAA"). *See* TRO Br. 4-6. NBME agrees.

However, an individual seeking accommodation must still prove that she is, in fact, disabled within the meaning of the statute. *Neely v. PSEG Texas, LP*, 735 F.3d 242, 245 (5th Cir. 2013) ("Although the text of the ADAAA expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability...."). While ADHD can be a disability under the ADA, it is a disability only if it substantially limits a person's ability to perform major life activities as compared to most people.

The evidence here does not support a finding that Ms. Whyte is likely to succeed in showing that she has ADHD or that the ADHD substantially limits her ability to read or concentrate while taking a standardized test as compared to most people in the general population. *See, e.g., Mann v. Louisiana High Sch. Athletic Assoc.*, 535 Fed. Appx. 405, 410 (5th Cir. 2013) ("Although the ADA Amendments Act of 2008 lowered the standard that plaintiffs must meet to show that they are disabled, . . . a plaintiff must still show substantial limitation....") (reversing grant of preliminary injunction because diagnosis of anxiety disorder, standing alone, was insufficient to show disability under the ADAAA).

Ms. Whyte has provided the Court with a settlement agreement that NBME entered into with the U.S. Department of Justice in 2011 to amicably resolve a complaint filed by an individual examinee. *See* TRO Br. 7. To the extent that Ms. Whyte is suggesting that NBME somehow failed to review her accommodation request in a manner consistent with the provisions of that agreement, she is wrong. Consistent with the agreement's statement of NBME's rights and obligations under the ADA, NBME independently examined Ms. Whyte's supporting documentation and sought input from external professionals. *See* Settlement Agreement ¶ 17. It carefully reviewed the conclusions reached by her supporting professionals, but it was not

required to defer to those findings. *Id*. NBME and its external professionals appropriately considered whether her ADHD diagnosis was consistent with "generally accepted diagnostic criteria," *id*. at ¶ 14, and appropriately considered her "academic records and other objective evidence" in determining whether her documentation supports a finding that she is substantially limited in comparison to "most people," *id.* ¶¶ 15, 16.

### III.   MS. WHYTE HAS NOT SHOWN A RISK OF IRREPARABLE HARM

Ms. Whyte makes only a passing effort to establish a risk of irreparable harm. She asserts that "she will no longer be enrolled" in medical school and "will not obtain a degree" if she "does not pass Step 2 [CK] of the USMLE," TRO Br.18, but she offers no evidence to support this assertion. Nor does she offer any evidence to support her related assertion that she is "required to take and pass the USMLE Step 2 by May 24, 2018 or she cannot return to Medical School." Complaint ¶ 37.

There is no evidence that Ms. Whyte is about to be removed from medical school, or that the reason for her alleged impending dismissal is her failure to pass the Step 2 CK exam rather than other factors. There is no evidence that she cannot obtain additional time from her medical school within which to take the Step 2 CK exam. It is speculative that a need for extra testing time explains Ms. Whyte's inability to pass Step 2 CK the first and only time she took that exam, as opposed to her knowledge of the subject matter, her preparation, her mood the day she tested (*e.g.*, was she anxious or depressed), or whether she got a good night's sleep the night before.[6]

---

[6] A failure of proof on the issue of causation would preclude Ms. Whyte from establishing that NBME violated the ADA by denying her accommodations, even if she could show that she has been properly diagnosed with ADHD and that the ADHD substantially limits her ability to perform one or more major life activities. *See, e.g., Singh v. George Wash. Univ. Sch. of Medicine*, 667 F.3d 1, 5-6 (D.C. Cir. 2011) ("We need not decide whether Singh has an impairment within the meaning of the ADA, or whether that alleged impairment substantially

Indeed, if her performance on the SAT, MCAT and Step 1 exams are any indication, factors other than testing time explain why she did not pass the Step 2 CK exam in 2016: on those other exams, her scores improved dramatically the second time she tested, even though she received the same amount of testing time on each administration.

The harm alleged by Ms. Whyte is thus factually unsupported and entirely speculative. Such speculative harm cannot support preliminary injunctive relief. *See Siegel v. Lepore*, 234 F.3d 1163, 1176-77 (11th Cir. 2000); *see also Rothberg v. Law Sch. Adm. Council,* 102 Fed. App'x 122, 125 (10th Cir. 2004) (finding, on the question of irreparable harm, that "the harm alleged by [plaintiff test-taker] is speculative") (overturning preliminary injunction); *Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632 at *5-6 (noting that plaintiff's argument regarding his likely test results if he tested without accommodations was speculative, as he had successfully taken other standardized tests without accommodations) (denying preliminary injunction); *Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 U.S. Dist. LEXIS 86837, *14-15 (E.D. Pa. 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives.  For example, she does not discuss whether her school might grant her an extension of the seven-year requirement and provides no evidence of an inability to transfer schools."); *Kelly v. W. Va. Bd. of Law Exam'rs*, 2008 U.S. Dist. LEXIS 56840, at *6 (S.D. W. Va. 2008) (no irreparable harm where plaintiff successfully completed other examinations without accommodations); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005)

---

limited a major life activity.  The … factual finding on causation … alone dooms her case.  The district court identified 'many reasons aside from [Singh's] impairment that might explain why [she] has done relatively poorly on extremely time-limited tests.'").

("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.") (denying preliminary injunction).

Ms. Whyte asserts that she is "required to take and pass the USMLE Step 2 [CK]  by May 24, 2018 or she cannot return to Medical School."  Complaint ¶ 37.  She will not have the results from her Step 2 CK exam by May 24 under any scenario, however, because it takes approximately three weeks for scores to be reported.  If she simply has to take the test by May 24, she does not need a TRO to do so.  She is already scheduled to test on May 24 under standard conditions, and she may well pass if she does so.  She took the GRE exam without accommodations and did well enough to gain admission to a well-regarded graduate school program.  She did exceedingly well on the MCAT exam with no accommodations. She passed Step 1 without accommodations.  And she came very close to passing the Step 2 CK exam with no accommodations.  If she is adequately prepared and knows the subject matter, there is no reason to conclude that she will not achieve a passing score if she re-takes the Step 2 CK exam under standard testing conditions.

Finally, to the extent there is an inflexible school requirement that she pass the Step 2 CK exam within six years of matriculating at the school, this is a problem of her own making.  She could have taken the Step 2 CK multiple times before now without accommodations, and she may well have achieved a passing score.  She could also have filed her court complaint and sought a preliminary injunction when she was first denied accommodations on the Step 2 CK exam, in 2016.  The urgency that purportedly warrants emergency relief is thus attributable to her own actions, which further "militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

## IV.    THE BALANCE OF EQUITIES FAVORS NBME

Ms. Whyte makes no effort to balance her claimed harm against the harm a TRO would cause NBME. She asserts her alleged harm, ignores the harm to NBME, and then simply quotes at length from a court case. *See* TRO Br. 18-19.

NBME carefully and conscientiously reviews accommodation requests to ensure that the USMLE program is fair to all examinees, and to protect the comparability and validity of USMLE scores. Because of those concerns, the potential harm to NBME if it is ordered to provide unwarranted accommodations to a candidate outweighs any speculative harm to Ms. Whyte from not being able to test with accommodations. *See Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004).

## VI.    AN INJUNCTION DOES NOT SERVE THE PUBLIC INTEREST

Ms. Whyte does not address the public interest factor. That is not surprising, given the broader interests at issue here. "Although the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests." *Bach*, 2014 U.S. Dist. LEXIS 124632, at *7-8. Other candidates do not want extra testing time to be granted to individuals who are not disabled, as that could provide an advantage that is denied to other test takers. Nor do score users want unwarranted accommodations to affect the resulting scores. This is particularly true in the context of licensing examinations that help protect the public welfare -- in this instance, by helping to ensure that licensed physicians have the minimum competencies to deliver safe and effective healthcare services. Factoring these other interests into the mix, the public interest supports not awarding accommodations when the record evidence does not establish that accommodations are warranted.

## CONCLUSION

Ms. Whyte's motion for a temporary restraining order should be denied.

Dated: May 21, 2018                       Respectfully submitted,


                                          /s/ Lee M. Gillis, Jr.
                                          LEE M. GILLIS, JR.
                                          Georgia State Bar No. 217515
                                          James-Bates-Brannan-Groover-LLP
                                          231 Riverside Drive
                                          Macon, GA 31201
                                          Telephone:  478-749-9942
                                          lgillis@jamesbatesllp.com

                                          Counsel for Defendant NBME

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing brief and supporting declaration of Catherine Farmer, Psy.D., and exhibits thereto, were filed via CM/ECF on May 21, 2018, which will send a Notice of Electronic Filing to counsel of record for plaintiff, which constitutes service.

*/s/ Lee M. Gillis, Jr.*
LEE M. GILLIS, JR.
Georgia State Bar No. 217515

Counsel for Defendant NBME

JAMES-BATES-BRANNAN-GROOVER-LLP
231 Riverside Drive, Suite 100
Macon, Georgia 31201
Telephone:     (478) 742-4280
Facsimile:     (478) 742-8720
lgillis@jamesbatesllp.com