```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF GEORGIA
 2                         ATHENS DIVISION

 3                 _____

 4    SARA WHYTE                    :  Case No. 3:18-CV-62-CAR
                         Plaintiff
 5           VS.                    :       May 21, 2018

 6    NATIONAL BOARD OF MEDICAL     :        Macon, Georgia
      EXAMINERS
 7                       Defendant  :
      _____
 8

 9                     TRANSCRIPT OF TRO HEARING
                 BEFORE THE HONORABLE C. ASHLEY ROYAL,
10                UNITED STATES COURT DISTRICT JUDGE

11

12    APPEARANCES:

13    FOR THE PLAINTIFF:      RALPH GOLDBERG
                              LAURENE CUVILLIER
14                            GOLDBERG & CUVILLIER, PC
                              1400 MONTREAL ROAD
15                            SUITE 100
                              TUCKER, GA 30084
16

17    FOR THE DEFENDANT:      LEE M. GILLIS, JR
                              WILLIAM P. HORKAN
18                            P.O. BOX 4283
                              MACON, GA 31208
19

20    BY TELEPHONE:           ROBERT BURGOYNE

21

22    _____

23                       TAMMY W. DIROCCO, USCR
                              P.O. BOX 539
24                       MACON, GA 31202-0539
                            (478-752-3497)
25
```

1    May 21, 2018

2    3:30 P.M.

3              THE COURT:  Good afternoon.

4              ATTORNEYS COLLECTIVELY:  Good afternoon, Judge.

5              THE COURT:  I'm Judge Royal, and we have a TRO

6    Motion here and we have a hearing related to that.

7              I have been through quite a bit of the material that

8    has been submitted to me.  I think I have a pretty good

9    understanding about what this case is about.  I think I have a

10   good understanding about the law related to the ADA.

11             And I want to start out by making a few observations

12   here.  You know, I don't get a lot of TROs filed in Federal

13   Court.  I may get two or three a year.  I may have had 30 or

14   40 over the time that I have been here.  And the problem with

15   the TRO is that -- as the law explains it, and I'm sure the

16   lawyers are familiar with -- because of preliminary

17   injunction, or in this case a TRO, is an extraordinary and

18   drastic remedy its grant is the exception rather than the

19   rule.  The Plaintiff must clearly carry the burden of

20   persuasion.

21             Now, the lay people in this room don't understand

22   that but the lawyers do, and that is one of the highest

23   standards that we have to deal with in granting or denying a

24   motion.  So that's very important.

25             Of course, there are elements that we have for a

1    TRO.  The first one is there has to be a substantial

2    likelihood of success on the merits.  There has to be

3    irreparable harm to the Plaintiff if the TRO is not issued.

4    The threatened injury must outweigh the harm that the TRO

5    would cause to the nonmoving party and that the TRO must not

6    be adverse to the public interest.

7            It seems to me, in this particular case, that the

8    question is, one, is there a substantial likelihood of success

9    on the merits and, two, is there going to be irreparable harm.

10   Those seem to me to be the issues.

11           Now, I will give you the opportunity to disagree

12   with me if you don't think that's accurate and if it's not

13   accurate tell me why it's not.

14           Don't stand up in my courtroom.  That's the usual,

15   but we don't do it that way here because I want you by that

16   microphone, okay.  And it's going to take you a couple times

17   trying to stand up and I'm going to wave you off again, but

18   that's fine.  Go ahead.

19           MR. GOLDBERG:  Your Honor, you are generally right.

20   However, the Circuit Law is that it's also a sliding scale and

21   that it isn't like you have to prove each and every of those

22   four parts you just talked about.  And I cited in my brief the

23   *Texas versus Seatrain* where the Court says that there are

24   those four standards --

25           THE COURT:  Right.

1            MR. GOLDBERG:  -- but it says that they must show

2    that you're going to win is basically a negative standard.

3    And what they mean is this:  That if you have no chance of

4    winning you're out, but that you don't have to show, even by a

5    preponderance of the evidence, that you will win.  Wright and

6    Miller call it the prima facie case.  But *Texas versus*

7    *Seatrain* talks about the idea that you have to show a

8    probability of winning, and it talks about the idea that it is

9    a sliding scale.  So that, for example, the greater the harm

10   the less likely you need to show that you can win even though

11   you -- you have to make some showing that you would win.  You

12   can't simply say "I have all this harm" if you know you're

13   going to lose.

14           THE COURT:  All right.  Is it Mr. Horkan?  Who do we

15   have for the Defendant?

16           MR. GILLIS:  Your Honor, Mr. Gillis.

17           THE COURT:  Are you going to respond to that?

18           MR. GILLIS:  Yes, Your Honor.  I do agree with the

19   Court that the first two elements are the most important here.

20   However, I do think that the Plaintiff should be required to

21   meet all four of the elements and it's our position that she

22   can meet none of them.

23           THE COURT:  Okay.  Well, that's fine.  We will deal

24   with that in just a minute.

25           And, of course, I'm familiar with the ADA and the

```
1    requirements related to that, and it seems to me that under

2    the circumstances of this case -- and again I'm trying to

3    narrow down some of the issues -- it seems to me that the real

4    question in this case is whether she has a disability as

5    defined under the ADA.  I wouldn't think that the

6    reasonableness of the accommodations she is requesting is

7    really at issue in this case.  And I can't imagine that this

8    somehow alters the course of business, whatever, of the

9    Defendant in this case.

10            So is this a case involving whether or not she has a

11   disability or is it more than that?

12            MR. GOLDBERG:  Your Honor, I think it really --

13   really whether or not she has a disability.  The

14   accommodations that she's asking for are nothing extraordinary

15   in ADA litigation.

16            THE COURT:  All right.  Mr. Gillis?

17            MR. GILLIS:  Your Honor, we would agree that

18   disability is the largest question.  The only thing my client

19   would like the Court to know is it's not as simple as just on

20   Wednesday when this test is administered giving her

21   accommodations.  The program has to be recalibrated and a room

22   has to be found.  But those are things that have to be dealt

23   with in the relief she's seeking.

24            THE COURT:  Right.

25            MR. GILLIS:  But as far as what she's asking for
```

```
1   it's more the practical implications of those.
2            THE COURT:  The mechanical part of it?
3            MR. GILLIS:  Yes, Your Honor.
4            THE COURT:  Not the legal part of it?
5            MR. GILLIS:  Yes, Your Honor.
6            THE COURT:  So we're dealing with the disability
7   issue here.
8            Let me just go through this and make a few
9   observations.  I didn't find in the report that she -- that
10  you gave me -- hold on.  Let me see if I can find it.  I
11  didn't find in the 1988 report that she was diagnosed with
12  ADHD.  Am I correct in that?
13           MR. GOLDBERG:  Your Honor, I do not agree with that.
14  And let me see if I -- I'm not going to tell you that
15  everything I'm about to tell you is in one piece of paper, but
16  let me see if I can take you through this.
17           Your Honor, I sent something called a Student
18  Accommodation Plan which is one of my exhibits from the
19  Decatur Schools and this is in 1999.
20           THE COURT:  We're not talking about 1999.  We're
21  talking about 1988.  We're talking about 1988.  We're talking
22  about the Behavioral Institute of Atlanta, evaluation dates
23  5-5, 5-9, final conference 5-12-1988.  That's what we're
24  talking about.
25           MR. GOLDBERG:  Your Honor, in the Behavior Institute
```

1    I do not see anything, but I do note that in Dr. Raque's

2    affidavit -- you're right.  Your Honor, he goes to 1996.  So

3    in 1998 there is nothing.  You're right.

4             THE COURT:  And, of course, that's one part of the

5    diagnosis under the DSM-5 now, I guess, that this diagnosis

6    needs to be made early in childhood; isn't that correct?

7             MR. GOLDBERG:  Yes, Your Honor.  But early in

8    childhood under DSM-5 doesn't mean seven.  It means 12 years

9    old.

10            THE COURT:  And was it made by 12?  I'm not clear

11   about that.

12            MR. GOLDBERG:  My client believes that it was, Your

13   Honor.

14            THE COURT:  What would have been the occasion for

15   that?

16            MR. GOLDBERG:  I think it's the Student

17   Accommodation Plan that is dated January 14th, 1999, which

18   talks about how she has been diagnosed with Attention Deficit

19   Disorder and Learning Disability and their participants -- the

20   very bottom participant is Marty Avant --

21            THE COURT:  So she would have been 17 at that point?

22            THE PLAINTIFF:  Yes, Your Honor.

23            THE COURT:  This was when you were a junior in high

24   school?

25            THE PLAINTIFF:  Yes.  But I was diagnosed when I was

```
 1   eight years old.  I went to a school called the Schenk School.
 2   I couldn't read, and they diagnosed me there with ADD -- they
 3   didn't have the H back then --
 4              THE COURT:  Right.
 5              THE PLAINTIFF:  -- and learning disability in
 6   reading.  I can't find the form though to find where it was
 7   written there.
 8              THE COURT:  I don't remember seeing that.
 9              MR. GOLDBERG:  Your Honor, I don't remember showing
10   it too, in all honesty.
11              THE COURT:  Well, that would have been helpful,
12   wouldn't it?
13              THE PLAINTIFF:  Well, I have all that paperwork.
14              THE COURT:  Well grab it then.  And, of course, that
15   was not available to the -- that was not available to Benjamin
16   J. Lovett Ph.D. who apparently was -- I take it -- was an
17   independent contractor for the Defendant; is that correct?
18              MR. GILLIS:  Yes, Your Honor.
19              THE COURT:  That you got to do an evaluation --
20              MR. GILLIS:  Yes, Your Honor.
21              THE COURT:  -- and made the comment in the report
22   that it was only in the 11th grade that this diagnosis was
23   made or maybe didn't say it quite like that, but that was the
24   first time there was some effort to somehow accommodate this
25   problem.
```

1           MR. GILLIS:  Yes, Your Honor.  We take the position

2     that the 504 plan in 1999 does not make a diagnosis, but does

3     discuss the issues, but makes no diagnosis.

4           THE COURT:  Right.  Okay.

5           I'm interested now -- I have some questions that

6     need to be answered by the Plaintiff, and I'm wondering if it

7     might be better just to put her under oath and let her take

8     the witness stand and then she can be cross examined if

9     necessary.  Because in reviewing these various reports there

10    are certain things that aren't clear and she may be able to

11    give some clarity to some of those things.

12          Part of the problem with her sitting there and

13    answering is it's hard to hear her.  She's not over there by

14    the microphone.  And typically in a hearing like this the

15    witnesses would be under oath.  Sometimes I'm informal, but --

16          MR. GOLDBERG:  Your Honor, if you want her under

17    oath, of course, if you want her next to the microphone I'll

18    move my microphone over and share my partner's microphone.

19    Whichever one you want.

20          THE COURT:  I think it would be better to put her up

21    here because he can see her -- Mr. Gillis can see her better.

22    That would be the best way to do this.

23          MR. GOLDBERG:  Your Honor, I believe that what she

24    is referring to is in your record.  It's from the Behavior

25    Institute of Atlanta.  I'm not certain, in all honesty, that

```
1    they made an ADHD diagnosis.  I think they made a learning
2    disability diagnosis.
3              THE COURT:  Well, she had a learning disability
4    diagnosis at one point and then later -- I think it was in
5    this report that I'm getting ready to cover -- she didn't have
6    a learning disability diagnosis.
7              MR. GOLDBERG:  University of Georgia said she did
8    not.  I must say that Dr. Raque thinks she does.
9              THE COURT:  Well, I'm going to have to tell you I'm
10   not impressed with his affidavit.  I'm not convinced that it
11   satisfies Rule 702.  It looks to me like he's just adopting
12   what's in this report, and I found that to be problematic,
13   especially since the time that he dealt with her was so much
14   earlier.
15             So I read that.  I understand what it says, but I
16   didn't find it very compelling, not to mention I think there
17   may be 702 problems with it.
18             MR. GOLDBERG:  Your Honor, we are prepared to rely
19   upon the University of Georgia report.
20             THE COURT:  Right.  Well, that's what we're getting
21   ready to talk about, and, so, this is my first question.
22             Go ahead and swear her in, please.
23             COURTROOM DEPUTY:  Do you solemnly swear that your
24   testimony in this case shall be the truth, the whole truth,
25   and nothing but the truth, so help you God?
```

1          THE PLAINTIFF:  Yes.

2          COURTROOM DEPUTY:  State your name for the record

3    please.

4          THE PLAINTIFF:  Sara Whyte.

5          COURTROOM DEPUTY:  Spell your last name.

6          THE PLAINTIFF:  W-H-Y-T-E (spelling).

7          THE COURT:  Let me just explain to you.  Mr. Gillis

8    has been in my court before, but you never have, and I don't

9    generally run my court in the way judges often do where I let

10   the lawyers stand up and make a long argument.

11          Typically what I do is I go through and talk about

12   the evidence that I find that's important.  I ask questions

13   about it, and then I move through and you can listen and

14   you'll hear what I think is important in the case, and then I

15   always give the lawyers the opportunity to respond.  But

16   proceeding this way I generally find out what I want to know

17   much faster than if I just let the lawyers talk.

18          MR. GOLDBERG:  Your Honor, Judge Owens used to do

19   the same thing.  I remember at one point he was asking

20   questions and the Attorney General's office got up and

21   objected and I couldn't believe it.  So I'm used to this.

22          THE COURT:  Okay.  So what happened -- what was the

23   occasion in March of 2015 for you to have this examination

24   that was done?

25          THE PLAINTIFF:  So I was in medical school.

1          THE COURT:  Right.

2          THE PLAINTIFF:  And I was applying to take Step 1 of

3     the USMLE.  And I've always had accommodations from the time I

4     was in high school until all the way through medical school.

5     So I applied for accommodations and they denied it and said

6     that my latest testing, which was the one at the time done by

7     Dr. Lancelot, was too old and I needed to be retested.

8          So I failed the exam.  So I decided I'll try again,

9     but this time I'll get the testing done, so I went and got the

10    testing done, and then I applied again and they still denied

11    me.

12         THE COURT:  Well, one of the observations made here

13    -- and y'all are welcome to follow along with me.  I'm now on

14    page 2 down at the very bottom of the page, last sentence.

15    And, of course, a lot of this report is made up of

16    self-reported information or information reported by people

17    who, I guess, family members, friends.  I'm not exactly clear

18    who all it was.  So there is a lot of self-reporting that goes

19    on here.

20         It says: "Relative to her high average overall

21    ability, as a well as the general population, she has

22    exhibited an academic deficit in reading efficiency, which

23    involves reading rate and the understanding of text-based

24    passages under time conditions."

25         Now, is that your statement or is that an opinion?

1    Do you know?

2              THE PLAINTIFF:  It's a --

3              THE COURT:  I'm trying to understand if that's what

4    you said or if that's what this --

5              THE PLAINTIFF:  That's what the Doctor is saying.

6              THE COURT:  That's what the Doctor is saying based

7    on what you said or do you know if that's an opinion that he's

8    giving?

9              THE PLAINTIFF:  I think he is basing it off of all

10   of the testing that he did, which also included some

11   self-reporting.  But there was two days worth of testing.

12             THE COURT:  Well, part of the testing that we're

13   talking about that he did there was at least one objective

14   test, and on that particular objective test you scored okay.

15   Do you remember that?

16             THE PLAINTIFF:  No.  Which test?

17             THE COURT:  Tell you what, let me go through this in

18   this order.

19             THE PLAINTIFF:  Okay.

20             THE COURT:  It says: "Although Ms. Whyte was

21   previously diagnosed with a learning disorder, -- now I'm on

22   page 3, first full paragraph -- her pattern of test results

23   based on current evaluation suggests that she no longer meets

24   criteria for a learning disorder diagnosis."  And I think that

25   you conceded that.

1          It goes on to say: "Relative to the general

2    population, Ms. Whyte's basic reading decoding fell well

3    within the average range.  It appears that many of her

4    learning disorder difficulties have been remediated, likely as

5    a result of the intensive and specialized training that she

6    received during the elementary school years at the Schenk

7    School."

8          And so, I mean, here -- and, of course, this is one

9    of the important points -- might be the most important point

10   that the Defendant is making -- is that if we're going to do

11   an analysis here to determine whether or not she has a

12   disability that analysis needs to be based on the average.

13         And I understand that the Plaintiff's counsel

14   disagrees with that and it's supposed to be within her peers,

15   which in this particular case would be all medical students.

16   But it appears that she is well within the average range based

17   on this testing that was done.

18         Am I misunderstanding that?

19         MR. GOLDBERG:  Your Honor, let me refer you to -- I

20   don't think you are misunderstanding this but let me refer you

21   to the test at the very back of the Georgia --

22         THE COURT:  We're going to get there.  I have these

23   things highlighted.  So I'm going through my highlights and

24   when I get through these I'm going to let you offer whatever

25   you want to offer from this report.  I'm trying to make sure

1     that I understand some of the things that are stated here.  I

2     think I do, but I don't know for sure that I do.

3              THE PLAINTIFF:  Sir, my reading comprehension was at

4     30 which is actually at the cutoff line for below average and

5     average.

6              THE COURT:  But is it 30 among college educated

7     people or is it 30 among all people?  Because I've understood

8     it's 30 among college educated people.

9              THE PLAINTIFF:  It is, yes.

10             THE COURT:  And only 40 percent of the population in

11    America has a college degree.

12             THE PLAINTIFF:  College seniors.

13             THE COURT:  Right.

14             MR. GOLDBERG:  Your Honor, since she opened it up,

15    the same thing also shows that she has a reading speed which

16    goes into the understanding.

17             THE COURT:  That's the 6 percent.

18             MR. GOLDBERG:  That's the 6 percent.

19             THE COURT:  Right.  We're going to come to that.

20    Because I need some clarity on that.

21             And then page 5 says -- and this is the last

22    sentence of the next to the last paragraph -- "Given that the

23    reported and observed symptoms primarily involve inattention,

24    a diagnosis of ADHD, inattentive type is supported by the

25    current evaluation."

1              Now, tell me about this evaluation that was done

2    here.  What did they do?  Obviously -- I know they tested you

3    but what else did they do?

4              THE PLAINTIFF:  What do you mean?

5              THE COURT:  Well, how long were you there?  How many

6    people saw you?  What did you do while you were there?  Beyond

7    the testing -- beyond the testing that was given, which I can

8    read about.

9              THE PLAINTIFF:  I was there for two days.  And the

10   first day was a full workday, eight or nine hours, and the

11   second day was about a half workday, four to six hours.

12             I saw, I think, at least three grad students and

13   Dr. Miller, may be one of his partners, I can't remember.  We

14   did a battery of exams.  Some of the exams entailed reading to

15   me and I would answer questions.  It entailed me reading

16   something and then answering questions.  It entailed me taking

17   an exam without extra time and then retaking it with extra

18   time and showing the scores between that.  It involved looking

19   at made-up words and being able to read them and trying to

20   come up with, I guess, a definition of the word.  There was

21   one test where I had to sit for 30 minutes and click a button

22   every time a little red dot came up.  It was awful.

23             I can't remember all of the exams.  It has been

24   three years.  A lot of it didn't make a lot of sense.  There

25   was some math portions.  I think I did a little bit of

```
 1   calculus and algebra, and spacial awareness test where they
 2   give you shapes and then ask you to redraw them differently.
 3             THE COURT:  And how many people interviewed you?
 4             THE PLAINTIFF:  It must have been at least four,
 5   maybe five.
 6             THE COURT:  Altogether or at different times?
 7             THE PLAINTIFF:  Different times.  I think it's all
 8   the people that signed at the end.
 9             THE COURT:  At the bottom of this page: "Ms. Whyte's
10   husband's responses suggested internalizing problems in the
11   clinical range which included clinically significant
12   depressive symptoms."  I think -- are you taking Wellbutrin?
13             THE PLAINTIFF:  I am, sir.
14             THE COURT:  How long have you been taking that?
15             THE PLAINTIFF:  I just restarted it a month -- two
16   months ago.
17             THE COURT:  Is that an antidepressant?
18             THE PLAINTIFF:  It is, sir, but it is also used for
19   ADHD.
20             THE COURT:  So it's for a combination of purposes?
21             THE PLAINTIFF:  Uh-huh.
22             THE COURT:  Are you taking it for depression or are
23   you taking it for ADHD or are you taking it for both?  Do you
24   know?
25             THE PLAINTIFF:  I'm taking it for both, I believe.
```

```
1    But I actually started taking Alazopram, but again that was

2    for the ADD and the depression.

3              THE COURT:  Now, I am on page 7, and I'm looking

4    under Reading Efficiency, the first sentence there.  "Reading

5    Efficiency involves the ability to efficiently read and

6    understand text-based passages under timed conditions.

7    Mrs. Whyte's reading rate on a task that involved reading

8    passages under timed conditions was borderline impaired" --

9    and that puts you in the sixth percentile.  Does this -- do

10   you know and you may not know -- but does this mean how fast

11   you can actually read the words on the page?

12             THE PLAINTIFF:  Yes, sir.

13             THE COURT:  That's what it means?

14             THE PLAINTIFF:  Yes, sir.

15             THE COURT:  So if I gave you this legal document to

16   read you would only be able to read X number of words in a

17   certain time period; is that right?

18             THE PLAINTIFF:  Yes.  I read at about the same -- I

19   think it's about the same pace as if you were reading out

20   loud.  I'm not entirely sure, but that's my opinion from what

21   I have gathered.

22             THE COURT:  If I was reading out loud?

23             THE PLAINTIFF:  Yes, if you read out loud which is

24   usually faster than most people read in their head.

25             THE COURT:  So that's what 6 percent means?
```

1          THE PLAINTIFF:  I'm not sure.  It's just my opinion.

2     But that is what that means, I read slower.

3          THE COURT:  You collected several degrees before the

4     time that you got into medical school.  You were very

5     successful at Georgia Tech.  You were very successful at

6     Emory.  And there seems to be some question in here raised by

7     the Defendant's brief about when you didn't receive

8     accommodations.  What kind of accommodations did you get at

9     Georgia Tech?

10          THE PLAINTIFF:  I got time and a half for every exam

11     and I got a MD room I took my exams in.  On top of that they

12     offered other things like a note taker, they offered to read

13     all my books out loud for me, like a book on tape.

14          THE COURT:  And was that in every class or just some

15     classes?

16          THE PLAINTIFF:  Every class.  Every exam.

17          THE COURT:  And then what about at Emory?

18          THE PLAINTIFF:  I had the same things offered to me

19     at Emory but their tests were not timed anyway, so I did

20     not -- I used it sometimes, but not always.

21          THE COURT:  All right.  What about --

22          THE PLAINTIFF:  So the time was more important.

23          THE COURT:  -- what happened with you after January

24     of 1999 in high school?

25          THE PLAINTIFF:  I started -- they didn't really know

1    how to handle me at the time.  They didn't have an empty room

2    for me to take my exam in.  Often I was put out in the hallway

3    to take the exam.  Other teachers just said, you know, come

4    back after class to finish your exam.  I was always given time

5    and a half for my exams, but getting a quiet empty room was

6    not possible at the time.  However, my scores did go up.  I

7    made straight A's that year, I believe.  I don't remember

8    exactly, but I believe so.

9              THE COURT:  When you took the SAT, if I understand

10   correctly, you didn't have an accommodation then; is that

11   correct?

12             THE PLAINTIFF:  I did have accommodations then.

13             THE COURT:  Oh you did.  Okay.

14             THE PLAINTIFF:  If you look at the test results that

15   they sent there's a little asterisk on it.

16             THE COURT:  Oh you're right.  I'm sorry.  I do

17   remember that now.  You took it twice.  The first time you

18   didn't do very well and the second time you did quite well.

19             THE PLAINTIFF:  Uh-huh.

20             THE COURT:  And there was some notation in there

21   about -- it doesn't say what you got but you got something?

22             THE PLAINTIFF:  Yeah.  They don't like to say what

23   you got.

24             THE COURT:  What did you get with that?

25             THE PLAINTIFF:  I got time and a half and I took the

1   exam in an empty classroom down at Georgia State.  It was a
2   written exam back then, handwritten.
3          THE COURT:  What is the University of Georgia
4   Regents Center for Learning Disorders?  I'm not familiar with
5   that.  Tell me what that is?
6          THE PLAINTIFF:  It's actually really well known for
7   testing.  One of the best places to get tested, from everyone
8   in disability that I have talked to.  I believe it's
9   affiliated with Georgia at UGA.  They do mainly testing
10  there.
11         THE COURT:  I mean, is it its own separate building
12  or is it a part of some department, some University
13  department?
14         THE PLAINTIFF:  It's its own building, I believe.
15         THE COURT:  And where is that?
16         THE PLAINTIFF:  I don't remember the address, but
17  it's on campus.
18         THE COURT:  Okay.  Not that that matters.
19         THE PLAINTIFF:  It's in Athens.
20         THE COURT:  It says you graduated from high school
21  with a 3.85 and Georgia Tech with a 3.3 and then a 3.8 from
22  Emory University.  How much of that time were you on some kind
23  of medication?
24         THE PLAINTIFF:  I started taking Wellbutrin, I
25  believe, in high school.  So right around when I started --

1    when the 504 came about.  It was suggested to me by my

2    psychologist that I try Wellbutrin.  I took it all the way

3    through Georgia Tech, all the way through Emory and into

4    medical school.  I stopped it recently because my psychiatrist

5    at UGA thought I was on too many medications, and after

6    getting off of it I found that I was having a much harder time

7    after the Vyvanse runs out.  I also take Vyvanse.

8             THE COURT:  So you have basically been on it for 20

9    years?

10            THE PLAINTIFF:  Yes, sir.  I've gone up in amounts

11   since I started though, or up in dosage.

12            THE COURT:  Now I am on page 13.  It appears that

13   after you didn't pass the first part of this Step exam you

14   took six months off?

15            THE PLAINTIFF:  I took almost a year to study and

16   retake the exam.  I worked with a professor at school who went

17   over practice exam questions with me and helped me see where I

18   was missing questions, what I was missing and helped me figure

19   out a way to get through the question without having to read

20   the entire thing, because if I read the entire question I

21   don't have time to finish the exam.  I never take time to

22   think, I just read the question and pick an answer is the only

23   amount of time I have.  And by the time I get through about

24   the last ten questions I have about 30 seconds per question.

25   The last three I have to figure out the answer based off of

1    maybe a word I have picked up and the question.  I don't have

2    any time to read even two sentences.

3            THE COURT:  There is somewhere in here -- and I

4    thought I would run across it but I didn't see it -- and it

5    had to do with an objective test that you took.  The objective

6    test being for determining whether or not you had ADHD and

7    that objective test reflected that you didn't have it.

8            Do you know where that is, Mr. Gillis, in the brief?

9    What was that?

10           THE PLAINTIFF:  Did you say "did not have it?"

11           MR. BURGOYNE:  Your Honor, it's page 4.

12           THE COURT:  Page 4 of the report?

13           MR. BURGOYNE:  Page 4, Conners' Adult ADHD Rating

14   Scale.

15           THE COURT:  Okay.

16           MR. BURGOYNE:  Your Honor, I finally chimed in.  I

17   apologize, it's page 5.

18           THE COURT:  That was not what I was looking for.

19           MR. BURGOYNE:  No, it's page 5, first full

20   paragraph.

21           THE PLAINTIFF:  May I get my copy of it so I can

22   read along with you?

23           THE COURT:  Well I still haven't found it.

24           MR. GILLIS:  Your Honor, it's the paragraph

25   beginning Ms. Whyte's performance on the Integrated Visual

1    Auditory.

2            THE COURT:  Okay.  Here we go.  You're right.  Thank

3    you very much.

4            "Ms. Whyte's performance on the Integrated Visual

5    Auditory continuous performance task, a computerized test of

6    sustained attention, did not suggest" full "impairment." -- or

7    suggest impairment, not full impairment.

8            THE PLAINTIFF:  I had taken my Vyvanse --

9            THE COURT:  Wait just a minute.

10           THE PLAINTIFF:  Sorry.

11           THE COURT:  "This may be due to the fact that

12   Mrs. Whyte was taking her prescribed ADHD medication during

13   the evaluation.  Further, it is likely that Mrs. Whyte's ADHD

14   symptoms were minimized by the one-on-one, low-distraction

15   setting in which the current evaluation took place."  So I

16   will let you read this.

17           THE PLAINTIFF:  Thank you.  Okay.

18           THE COURT:  Now, the way I read this -- the way I

19   understood this was that this was the objective test that is

20   commonly used to determine whether someone has ADHD, and that

21   this test didn't suggest impairment, meaning that it doesn't

22   suggest that you have ADHD.  Am I misunderstanding this?

23           MR. GOLDBERG:  Your Honor, I believe you are

24   misunderstanding it.  First of all, DSM-5 talks about looking

25   at beyond testing.  But the very next paragraph -- the very

1   next paragraph tells why they are going to make a

2   determination that she has ADHD.  Even --

3           THE COURT:  I'm asking you about this test.  Am I

4   misunderstanding the purpose of this test and what this test

5   is supposed to show?

6           MR. GOLDBERG:  Your Honor, I'm going to let my

7   partner talk about that.

8           THE COURT:  Okay, that's fine.

9           MS. CUVILLIER:  The test that you were just talking

10  about only measures attention, but ADHD has several

11  components, attention as well as --

12          THE COURT:  Her specific sub-diagnosis is

13  inattention.

14          MS. CUVILLIER:  Right, but that's just a type of

15  ADHD.

16          THE COURT:  Right.

17          MS. CUVILLIER:  But ADHD also -- a diagnosis will

18  also measure distractibility and also will measure impulsivity

19  and the one that you are referring to only measured attention.

20          THE COURT:  Okay.  All right.

21          Now, I think maybe I am finished with this report.

22  I'm finished with this report.

23          If somebody would like to ask her some questions

24  about this or if you want to point out something to me about

25  it I'll be happy to hear what you have to say.

1              MR. GOLDBERG:  Your Honor, I do want to point out

2    the next paragraph because DSM requires looking at clinical

3    observations as well as testing.

4              THE COURT:  Right.

5              MR. GOLDBERG:  They put down the tested observation,

6    but it doesn't change their result.  I think that's the

7    important point.

8              THE COURT:  Right.

9              MR. GOLDBERG:  Your Honor, I want to go back to that

10   6 percent, because they did some tests on that 6 percent and

11   what they found was this; she was given a test of 38

12   questions.

13             THE COURT:  She got all the ones right that she had

14   time to complete?

15             MR. GOLDBERG:  Right.  But then they gave --

16             THE COURT:  And then when she was given some extra

17   time she got them all right?

18             MR. GOLDBERG:  Right.  And then we get back to the

19   6 percent.  Now, why is the 6 percent important?  If you look

20   at the letters in the National Board and I'm thinking of the

21   letter -- I think it's the last letter, the April of 2018

22   letter, but if not it's the other one, the October 2016

23   letter.  They talk about her being in the 30 percentile, but

24   then they leave off that 6 percent as though, you know --

25   number one, the 30 percentile, depending on how you look at

1    it, may itself be below average.

2            In the *Bartlett* case, which we cited numerous times,

3    the Defendant's attorney in that case suggested that if you

4    are at 30 percent by definition you are not within the

5    average.  Judge Sotomayor, you know, went off on something

6    different, but that was the argument of the Defendant's

7    expert.  But what we're saying is when you get to 30 percent

8    of comprehension and you add the 6 percent of reading speed

9    that means that the comprehension rate, in a timed test, has

10   always got to be lower.

11           THE COURT:  Well, the 30 percent would seem to be a

12   combination of the 6 percent and whatever else there was that

13   made up that component of that.  That's the way I understood

14   it.  Now I could be wrong, but that's why I'm giving you the

15   opportunity to respond.

16           MR. GOLDBERG:  Well, Your Honor, when I look at the

17   testing results those tests scores are reported separately.

18   They're not reported as one score.  And they're not even

19   reported as parts of the same score, and I think that's the

20   point that they make.

21           On page 16 they had the NDRT and I'm looking, Your

22   Honor, right about line 16 or so where it says NDRT.  Do you

23   see where I'm talking about?

24           THE COURT:  Yes.

25           MR. GOLDBERG:  First thing it says is Reading

1    Comprehension and then it says percentile 30 percent, but it

2    doesn't stop there.  It goes on to say Reading Rate 6

3    percentile.  Now, Your Honor, if I was reading it the way you

4    would I would assume that there would only be one line which

5    would be the Reading Comprehension rate.  They're measuring

6    two different things in those tests.  That's the point that I

7    would make.

8              THE COURT:  I see.  I understand what you mean.

9              MR. GOLDBERG:  And I mention this because no where

10   in any of the documents that the National Board has do they

11   even talk about that 6 percent, it's as though it doesn't

12   exist and it doesn't mean anything, but it does.

13             THE COURT:  All right.

14             MR. GILLIS:  May I respond?

15             THE COURT:  No.  I want to let him have the

16   opportunity.

17             Is there something else you want to offer from this?

18             Then, I'll be happy to hear from you about that.

19             MR. GOLDBERG:  Your Honor, I think this is what I

20   want to say:  The University of Georgia Center that we are

21   talking about is nationally know.  If you go back and look at

22   *Bartlett*, one of the cases we cited, and you look at the *Root*

23   case, which was in the Northern District and reversed on other

24   grounds, one of their professors, Noel Gregg who is now at

25   this point emerita, a Professor, was a lead witness.  If you

1   go back and you look at the report -- and I think this is very

2   significant -- it's on page 2.  The very first paragraphs.

3            THE COURT:  Wait just a minute, please.  Let me get

4   there.  Okay.

5            MR. GOLDBERG:  "The primary purpose of this

6   evaluation and report is to establish if Mrs. Whyte is

7   eligible for academic accommodations for disabilities as

8   allowed by the Georgia Board of Regents and in accordance with

9   Regents' guidelines for diagnosing learning disorders."

10           THE COURT:  Well, now, but that doesn't mean that

11  this incorporates or satisfies the ADA.  I understand this is

12  what it says, but I don't know what that means in terms of the

13  ADA.

14           MR. GOLDBERG:  This is what I think I would say.

15  The only reason that anybody has to give accommodations is

16  either the Rehabilitation Act or ADA.

17           And so what we have is the fact that we have the

18  flagship University of this state making a determination as to

19  accommodations, without harm to their academic reputation,

20  without any harm whatsoever, and they're given absolutely no

21   -- what's the word --  I don't want to use the term deference

22  that's too far -- regard is what I will use.

23           In the Department of Justice consent order that we

24  attached one of the things that they were supposed to do was

25  to give due regard to the clinical observations.  This is the

```
 1   clinical observation.
 2           When I look back and I read, you know, the pages
 3   that they sent today -- and I got them at 12 so I may not have
 4   read them as carefully as I needed to -- they have a
 5   psychologist Dr. Zecker, I believe his name is, he's from
 6   Iowa, and his report is from 2014, even before this thing is
 7   taken.  So they have nobody who has done anything comparable
 8   to this.  And they are simply saying that this report is worth
 9   absolutely nothing, but it's not.  I don't think you can go
10   around saying that the University of Georgia's standards are
11   particularly low.  I think they are particularly high.  And I
12   will just leave it at that.
13           THE COURT:  Okay.  Mr. Gillis, do you want to
14   respond?
15           MR. GILLIS:  Yes, Your Honor.  One thing that the
16   Court went through was the Plaintiff's academic background and
17   testing.  I do have some questions for her about further
18   testing she had.
19           THE COURT:  Go right ahead.
20           MR. GILLIS:  Ms. Whyte, did you take the GRE?
21           THE PLAINTIFF:  Yes, sir.
22           MR. GILLIS:  Did you take that with any
23   accommodations?
24           THE PLAINTIFF:  No, sir.
25           MR. GILLIS:  And you were admitted to Emory
```

```
1    University based upon that score of the GRE?

2              THE PLAINTIFF:  They only cared about the math

3    score.

4              MR. GILLIS:  But you were admitted, correct?

5              THE PLAINTIFF:  Yes, sir.

6              MR. GILLIS:  And in medical school you took the MCAT

7    twice, correct?

8              THE PLAINTIFF:  Yes.

9              MR. GILLIS:  And you took that without any

10   accommodations?

11             THE PLAINTIFF:  Yes, sir.

12             MR. GILLIS:  And on the second test you scored in

13   the 79th, 84 percentile?

14             THE PLAINTIFF:  In the first test I scored in the

15   6th percentile, I believe, yes, sir.

16             MR. GILLIS:  Actually your first test was a 19 and

17   23rd, wasn't it?

18             THE PLAINTIFF:  19 and 23rd?  Thank you.

19             MR. GILLIS:  And your second test was 79 to 84?

20             THE PLAINTIFF:  Yes, sir.

21             MR. GILLIS:  And that means that you were at the top

22   20 percent of individuals taking the MCAT on that

23   administration?

24             THE PLAINTIFF:  Yes, sir.

25             MR. GILLIS:  And that was done without
```

1    accommodations?

2              THE PLAINTIFF:  Yes, sir.

3              MR. GILLIS:  Your Step 1 Board you passed that

4    without accommodation, didn't you?

5              THE PLAINTIFF:  The second time, yes.  I failed it

6    the first time.  I took a year to study for that exam.  The

7    same with the MCAT I took the Kaplan review four times before

8    I was good enough to pass the MCAT well enough.

9              MR. GILLIS:  And Step 2, Clinical Skills exam, you

10   passed that without accommodation, correct?

11             THE PLAINTIFF:  No, sir.  Oh, Clinical Skills, yes,

12   I did.  That does not require any reading.  Clinical Skills is

13   you see 12 patients, I believe, or 15 patients.  You have 15

14   minutes to go in, get what you can from the patient, ten

15   minutes to write up everything, come up with a diagnosis and a

16   plan.

17             THE COURT:  So how is that carried out?

18             THE PLAINTIFF:  They use standardized patients.  It

19   is actors pretending to be whatever illness they want and you

20   don't do anything like a pelvic exam, anything invasive.

21             THE COURT:  So you are just in a room and they come

22   in and they talk to you and you --

23             THE PLAINTIFF:  It is suppose to be just like work.

24   I go in -- I knock on the door, I go in the room and I say who

25   I am, and I talk to them, "What's going on?"  And then I do a

1   physical exam.  And then I talk to them about, okay, here's

2   what I'm hearing you say, here's what I think I want to do,

3   what I think is going on, and then I leave and write that up.

4            THE COURT:  Okay.  All right.  Mr. Gillis?

5            MR. GILLIS:  Your Honor, those are the questions I

6   had for her that laid the foundation for my next points.

7            This 6 percent on the Nelson-Denny Reading Test

8   that's where reading rate is evaluated based upon one minute

9   of reading.  Here her performance on the standardized tests,

10  the MCAT, the GRE, Step 1 and Step 2 where she had to write

11  within ten minutes what she had, with no accommodations,

12  refute this 6 percent finding.

13           Additionally, the UGA report, as the Court noted, is

14  based upon a lot of self-evaluation.

15           THE COURT:  Right.

16           MR. GILLIS:  And the report notes:  Relative to the

17  general population Mrs. Whyte's basic reading decoding fell

18  well within the average range.  She has a pattern of generally

19  average basic reading and writing skills.  Her reading

20  efficiency was a relative weakness, but that is relative to

21  her overall superior verbal abilities.  Her basic reading

22  skills test that she was administered did not reflect academic

23  underachievement as compared to the general population, and

24  again there was no learning disability found in this report.

25           THE COURT:  Okay.  Now, let me ask a few other

1    questions.

2              THE PLAINTIFF:  He said there was a hint of a

3    learning disability, he could tell that it had been there, but

4    because of all the education that I have and because of all

5    the written word I have seen from the time I was younger until

6    now, that tests for learning disability reading does not

7    actually accurately diagnose me.  And he said that he would do

8    a different test, but that the standardized test people in

9    this state do not accept it.

10             THE COURT:  All right.  Well, I want to ask a few

11   questions here related to the irreparable harm component of

12   this.

13             THE PLAINTIFF:  Okay.

14             THE COURT:  It's unclear to me what the irreparable

15   harm is.  I think it says if you don't pass this test you're

16   going to be disqualified from medical school?

17             THE PLAINTIFF:  Yes, sir.

18             THE COURT:  Okay.  Well, tell me about that.

19             THE PLAINTIFF:  Okay.  Because of these exams and

20   it's actually taken me six years to finish school, not four --

21   so time and a half.  And I have passed all of my classes, all

22   of the exams with it, Step 1.  I have done all my clinical

23   courses that I've had to do going through the hospital for two

24   years.  I have passed all of that.  They have a 6-year rule

25   that you have to have finished everything by six years from

```
1   when you started even if you took time off, and that rule
2   comes up June 30th.  I have to have a passing score on Step
3   2 Clinical Knowledge in order to graduate.  If I do not get
4   that by June 30th then I don't get to graduate, I don't get
5   the degree, $300,000 thrown down the drain, no pass go.
6              THE COURT:  Okay.  And so this is not some kind of
7   National Standard, it's just a requirement of the Medical
8   School?
9              THE PLAINTIFF:  I asked the school about that.  It
10  was unclear whether it was a National Standard this six year
11  rule.  It may be just them, I'm not sure.
12             THE COURT:  But a rule is a rule.  That's the point.
13             THE PLAINTIFF:  Yeah, the rule is the rule.  And
14  because the NBME takes a while to grade the test and they
15  don't give you an exact amount of time of when they'll have
16  your score out -- I called the NBME up and they said you have
17  to have the exam done by May 30th if you want the score by
18  June 30th.
19             THE COURT:  Okay.  Are there any other tests or
20  exams that you have to take or is this the last one?
21             THE PLAINTIFF:  To graduate?  This is the last one.
22  After those, there is a Third Step to the licensing exam.  I
23  can take that anytime between now and, I think, my first year
24  of residency.  And then at the end of my residency I will take
25  a board exam, and then for the rest of my life I believe it's
```

1    every ten years you retake boards.

2             THE COURT:  Have you been accepted into a residency

3    program?

4             THE PLAINTIFF:  No.  I dropped out of the match

5    because I did not pass Step 2, CK.  And because I did not pass

6    Step 2 CK there is a question of whether I will graduate which

7    is why I dropped out of the match.

8             THE COURT:  Okay.  I understand.

9             THE PLAINTIFF:  Match is when you apply for

10   residency.  I did, however, get a lot of interviews or some

11   interviews.

12            THE COURT:  Either one of you want to talk about

13   this issue, questions, observations?  Do you want to ask her

14   anything?  I'm giving you -- along the way I'm giving you the

15   opportunity to respond or to solicit information from her,

16   evidence from her, if you would like to do that.  So now is

17   the opportunity before I move on to something else.

18            MR. GILLIS:  Sure, Your Honor.  Ms. Whyte, you took

19   the Step 2 CK exam in 2016; is that correct?

20            THE PLAINTIFF:  I think so.

21            MR. GILLIS:  And you missed that exam by five

22   points?

23            THE PLAINTIFF:  Four, I believe.  Is it 209 to pass?

24            MR. GILLIS:  Four or five, correct?

25            THE PLAINTIFF:  Yeah, four or five.

1          MR. GILLIS:  Your Honor, this irreparable harm

2     argument, I think, fails here because she took this exam in

3     2016.  She could have taken the CK exam multiple times since

4     then to get a score without accommodations.  She can sit here

5     and take the exam without accommodations on the 24th.

6          THE COURT:  Well, let me ask her.  Why didn't you

7     take this since you failed it the first time?

8          THE PLAINTIFF:  I failed it in December, I believe,

9     it was like the end of December.  I missed Christmas.  And I

10    didn't find out I failed until January.  That's when I went

11    and talked to my lawyers.  Because I had taken the exam --

12         THE COURT:  Wait a minute.  It took six months to

13    get the score?  You took it in the summer and you didn't find

14    out --

15         THE PLAINTIFF:  No.  It took like three to four

16    weeks.  It took four weeks to get the score back.

17         THE COURT:  Okay.  I misunderstood what you said.

18    When did you take it?

19         THE PLAINTIFF:  I took it like December 28th, I

20    think.

21         THE COURT:  This summer?

22         THE PLAINTIFF:  No.  I'm sorry, I took it December

23    28th.

24         THE COURT:  Oh December.  Okay.

25         THE PLAINTIFF:  I'm sorry.

```
 1              THE COURT:  Thank you.

 2              THE PLAINTIFF:  I got the score back, I think,

 3    sometime the end of January.  I had to talk to the school, go

 4    through multiple, I guess, hearings convincing the school to

 5    give me a second chance to take the exam.

 6              So it's not as easy as taking the MCAT where you

 7    just sign up and go.  Also, when you are applying for

 8    accommodations, which I did do again, you cannot sign up for

 9    the exam or take it while you are applying for accommodations.

10    So I had to wait for them to get back to me.

11              THE COURT:  Is that a school rule or is that a --

12              THE PLAINTIFF:  That is an NBME rule.

13              THE COURT:  Okay.

14              THE PLAINTIFF:  I talked to the school, figured

15    everything out, I put everything together.  I put together any

16    new information I could find for them, talked to my lawyers.

17    We sent out the application February 23rd.  They did not get

18    back to me about it so I called them every day that week until

19    somebody finally answered the phone and said "We don't have

20    anything from you."  And I said, "Yes, you do.  I sent it to

21    you."  They finally got it.  It took them over two months to

22    get back to me.  That is why it took so long for me to be able

23    to take this exam.

24              On top of that I have been taking a program called

25    the Pass Program to help me study for and prepare for this
```

```
1    exam and that has also been taking up time.

2              THE COURT:  Okay.  Mr. Gillis?

3              MR. GILLIS:  Your Honor, my point being that any

4    time in this process after she failed Step 2 CK exam she could

5    have filed this lawsuit, filed it through the injunction.  She

6    waited until the eleventh hour.  It's an emergency of her own

7    making.  However, there's no irreparable harm here.  Her past

8    test performance is if she does poorly the first time, the

9    second time she succeeds.  This harm is speculative.  And the

10   fact that she made very --

11             THE COURT:  Well, it sounds like she's going to get

12   kicked out of school if she doesn't pass it?

13             THE PLAINTIFF:  Yes.  That is it.

14             MR. GILLIS:  But, Your Honor, she knew that in 2016

15   after she failed the exam, hired lawyers and filed for

16   accommodation.  She could have filed for this injunction at

17   that time.

18             THE COURT:  Well, it sounds like you're making a

19   negligence argument now.

20             MR. GILLIS:  Well, I think it does weigh in the

21   irreparable harm, one's failure to mitigate your own damages

22   does matter here in the extraordinary remedy.

23             THE PLAINTIFF:  I --

24             THE COURT:  I'll give you an opportunity to respond.

25             THE PLAINTIFF:  Sorry.
```

1          MR. GILLIS:  It does matter because as the Court

2   noted she is seeking an extraordinary remedy and the

3   timeliness of that does matter.

4          THE COURT:  Okay.

5          THE PLAINTIFF:  I have a question.

6          THE COURT:  Go ahead.

7          THE PLAINTIFF:  I took my exam last December.  I

8   believe that was -- this year is 2018, am I right?  So that

9   was 2017.  Your dates are wrong.

10          MR. GILLIS:  Well, at any point, January is when she

11   figured out she failed the exam.

12          THE PLAINTIFF:  January of this year.  And I told

13   you exactly why it took that long for me to be able to take

14   the -- I could not take the exam and we did not file -- my

15   lawyers can actually answer the question as to why we have not

16   filed until now.

17          MR. GILLIS:  Your Honor, she also had filed for

18   accommodations previously and was denied and at that point she

19   could have also filed a lawsuit seeking an injunction.

20          THE PLAINTIFF:  It did not --

21          MR. GILLIS:  My point is, at numerous points down

22   this road, the Plaintiff could have sought a remedy that was

23   not this extraordinary remedy at the eleventh hour.

24          THE PLAINTIFF:  Can I ask a question or say

25   something?  Is that all right?

1              THE COURT:  Yes.

2              THE PLAINTIFF:  I did not -- it never occurred to me

3    that I could hire a lawyer to help me with this.  On top of

4    that, I'm not rich.  My husband and I are living paycheck to

5    paycheck.  We have never had the money to pay for a lawyer.

6    We have taken out extensive loans for this.  Before all that I

7    thought I could do this if I just put my nose to the grind

8    stone and work hard, which is what I have always done with

9    these exams.  But I cannot take a year off every time I have

10   to take the boards.  I will lose a year of work.

11             THE COURT:  Here is another question -- well,

12   Mr. Gillis, were you finished with that?

13             MR. GILLIS:  Yes, Your Honor.

14             THE PLAINTIFF:  I'm sorry, Mr. Gillis.

15             THE COURT:  Let's say that the Court allows you the

16   accommodations that you request here.  I guess one of the

17   questions that we don't know the answer to is even with the

18   accommodation are you going to pass the exam?

19             THE PLAINTIFF:  Yes, sir, I believe I will.

20             THE COURT:  And what's the basis of that?

21             THE PLAINTIFF:  The testing they did on me there I

22   scored -- I could actually finish the sections of the exam

23   instead of having to put in guesses for the last five or six

24   questions.  I could finish those questions.

25             On top of that I would actually have maybe a minute

1    to think about the answer.  When you're talking about
2    medicine, you're talking about how the body works.  This exam
3    is very well laid out in that it's not just asking you what is
4    this, what is this, what does that mean.  I'm not having to
5    search for a keyword.  Instead they are saying you know this,
6    now we're going to give you this obscure way of looking at it
7    and see if you understand it.  Is a minute and thirteen
8    seconds long enough to read a passage, a three paragraph
9    passage, and be able to explain how you understand it?  If I'm
10   talking about say hypothyroidism and -- I'm like -- I'm having
11   to think about, okay, I've got to go back to the hypothalamus,
12   the pituitary, then the thyroid, and the liver, where is the
13   problem along there?  I'm having to think through each part
14   and that takes time.  And I believe that if I had time and a
15   half that would give me enough time to finish those last five
16   questions of every section of which there are eight, it's 40
17   questions, and time to actually think about the answer a
18   little better.
19           When I was working with my professor, Dr. Cohen, he
20   would go over questions I missed with me, we called them low
21   hanging fruit questions.  I would read the question with him
22   and without even looking at the answer I know the answer.  And
23   then he says, "Well, why did you pick this answer?"  I don't
24   know, because I didn't have time to think about it, I didn't
25   have time to read it.

1          THE COURT:  Okay.  Now let's see.  I'm looking at

2    the brief, NBME's brief.  I'm looking at that now and I just

3    made some notes.  I'm going to look through these notes to

4    just see what caught my attention.

5          THE PLAINTIFF:  I had one other thing to say to what

6    Mr. Gillis had said about taking the exam multiple times.

7    You're only allowed to take it three times in your life, in

8    case you didn't know that.

9          THE COURT:  Well, one of the legal issues here --

10   and it's a very important legal issue and I've already

11   mentioned it -- and that is in determining whether she is

12   disabled or not.  The measure is not her peers, but the

13   general population, and I know that's a position that the

14   board has taken here.  This is a question for the lawyers.

15   What's your position on that?

16         MR. GOLDBERG:  Your Honor, I think that it's not

17   quite that simple.  I think the new amendments have changed

18   it.

19         THE COURT:  The '08 amendment?

20         MR. GOLDBERG:  The 2008 amendments.

21         THE COURT:  '08?

22         MR. GOLDBERG:  Yes.  Your Honor, I attached a law

23   review article and I think he says it better than I did,

24   because he worked on it a lot longer than I worked on this

25   brief.  But I mean, one of the problems is this, it seems to

 1    me that we are not -- and this really comes through in their

 2    brief it seems to me.  It basically comes through that if you

 3    are exceptionally bright, no matter what, you don't need

 4    accommodations, and if you're not exceptionally bright you

 5    don't deserve to be a doctor.

 6            THE COURT:  That's not the inference I drew.  The

 7    inference I drew is that there is a lot of abuse of this

 8    diagnosis, and that they are trying to be very careful that

 9    this isn't one of the abuse situations.  That's the way I

10    understand what they're trying to say here.

11            MR. GOLDBERG:  Well, Your Honor, the reason I think

12    I differ -- I think if you look at their letters.  One of the

13    things -- well, let me start off this way.  Your Honor, I

14    attached the Department of Justice consent order and that

15    actually has value.  I found this out yesterday when I was

16    doing my research.  According to the Supreme Court even

17    consent orders of administrative agencies are entitled to

18    deference.  Under *FTC versus Mandel Brothers* at 359 US 385,

19    391.  But what I think -- if you go look at the letters she is

20    presenting a history of accommodations, which is one of the

21    things under the regulations that is most important.  But what

22    does the board say in their letters?  Well the history of

23    accommodations doesn't matter.  Now they said it a little more

24    elegantly than I just did, but that's what they said.

25            I think the point is this:  If you look at all the

1    clinical evaluations -- and I keep coming back to UGA because

2    there is no answer to the UGA report.  None.  The expert that

3    I saw in their report, did his report in 2014 --

4         THE COURT:  Well, I read the one in '16.  I didn't

5    have the time to read the one in '14.  There was some very

6    interesting data that was used here:  Score reports from high

7    school graduation tests; records from the "student support

8    team" meeting and subsequent accommodation plan in Grade 11;

9    transcripts from college and medical school, as well as

10   additional performance evaluations from medical school; scores

11   from SAT, MCAT, AP tests; reports from diagnostic evaluations

12   completed in '88, '09 and '15; confirmation of accommodations

13   in medical school and in part in high school, and evidence

14   that parents requested disability services.  You know, 702?

15   That's adequate data as far as I'm concerned.

16         And there is information in here -- you know, this

17   evaluation done in '88 and they're talking about: "the

18   evaluators also observed that she seemed tired and easily

19   frustrated on the day of testing; they concluded that she may

20   simply be slow to develop certain skills, or might have a

21   learning disability, but that was too early to tell.  In

22   addition, they noted the parent and teacher rating scales were

23   "not significant" for attentional problems."  And I've

24   explained the importance of that.

25         "Her report cards used numerical codes for narrative

1   comments and all of her comments from teachers were positive

2   although codes were available for inattentive and disruptive

3   behavior, her teachers never endorsed these for her, instead

4   repeatedly describing her as being a pleasure to teach.  In

5   her application, she appears to report accommodations

6   throughout her high school time, but her documentation

7   actually suggests otherwise; it appears that in the middle of

8   the 11th grade; her parents wanted to ensure that she would

9   have an extended time on the college admission exam."

10          MR. GOLDBERG:  Well, Your Honor, the middle of the

11   11th grade is not --

12          THE COURT:  The fact that this is stated in here

13   does not mean I'm accepting this.  I'm trying to read some

14   important things out of it.  Because what you have here, in

15   terms of -- you're saying and this is the response to what you

16   said, you're saying that this report from the University of

17   Georgia is not refuted, and this report -- by someone who I

18   assume is qualified, they have a Ph.D -- is explaining what

19   those problems are.  And, you know, she reportedly took the

20   GRE without accommodation and gained entry into the public

21   health graduate program.

22          MR. GOLDBERG:  Your Honor, are you reading the 2014

23   report?

24          THE COURT:  I'm reading in the 2016 report.  That

25   was the most current one.

1              THE PLAINTIFF:  Your Honor, that's not something I

2      got, I don't think.

3              MR. GOLDBERG:  Your Honor, I apologize.  Could you

4      tell me -- I don't remember seeing that report.  I apologize.

5              THE COURT:  Well, I obviously don't know what you

6      got.

7              MR. GOLDBERG:  Your Honor, the report that I was

8      talking about, the one that I could find in your pages, is

9      dated May 28th, 2014.

10             THE COURT:  Right.  And I have that one but I didn't

11     have time to read it, but I wanted to read the most current

12     report and that's the 2016 report.  Are you telling me you

13     don't have that report?

14             MR. GOLDBERG:  Your Honor, is it by the University

15     of Georgia?

16             THE COURT:  No.

17             THE PLAINTIFF:  It's by the NBME?

18             THE COURT:  This is the report that came from

19     Mr. Gillis' expert.  Is that correct, Mr. Gillis?  Am I

20     understanding this correctly?

21             MR. GILLIS:  I think you are.  Your Honor,

22     Mr. Burgoyne is on the line.  He gathered it for us.

23             MR. BURGOYNE:  Yes, Your Honor.  That's one of the

24     external professionals that NBME consulted.

25             THE COURT:  Right.  And that's what I mentioned at

1    the very beginning of all this.

2              MR. BURGOYNE:  Yes.

3              MR. GOLDBERG:  Your Honor, what Exhibit Number is

4    it?

5              MR. BURGOYNE:  It's attached to the declaration of

6    Kathy Farmer.

7              THE COURT:  Nothing has any exhibit numbers on it.

8              MR. BURGOYNE:  It should have gone in with exhibit

9    numbers, Your Honor, but we will have to double check that.

10             MR. GILLIS:  Your Honor, it's Exhibit H to the

11   declaration.

12             MR. BURGOYNE:  Yes.  So it did go in.

13             MR. GOLDBERG:  Your Honor, I'm sorry, I now see it.

14             THE COURT:  Okay.  Good.  And I read from this and

15   if you'll look on page 2 of that exhibit -- and we've already

16   talked about this -- now I'm on the first full paragraph on

17   page 2 in the last sentence, which is a long sentence --

18   "However, Mrs. Whyte took the MCAT twice without

19   accommodations (her request was reportedly denied); the first

20   time some of her scores were below the average range (for

21   medical school applicants), whereas the second time, all of

22   her scores were in the average range or above with her

23   composite score being better than 80 percent of the medical

24   school applicants."  Now Mr. Gillis pointed that out earlier.

25             And it says, "Briefly, there is insufficient

```
 1   evidence of ADHD.  Really, the only evidence even consistent
 2   with the disorder has been the presence of symptoms reported
 3   by (a) Ms. Whyte, her friend, and family members during
 4   evaluations being conducted to determine her need for
 5   accommodations and medical school faculty.  The more recent
 6   reports of inattentive symptoms could be due to a variety of
 7   other factors; the incentive to obtain accommodations" --
 8   which is what I mentioned earlier -- "a general negative
 9   self-concept" -- which is very clear from the record -- "the
10   presence of anxiety and/or depressive feelings" -- which is
11   very clear from the record.  "In particular, there is a lack
12   of objective evidence of ADHD symptoms; the only performance
13   test designed specifically for measuring such symptoms was
14   administered in 2015 and failed to find evidence of such
15   symptoms."  And I explained that.
16           So I'm not saying that I'm accepting this, but this
17   is clearly disputing what is presented as a report from the
18   University of Georgia Regents Department or whatever the name
19   of that is.
20               THE PLAINTIFF:  May I answer that MCAT question?
21               THE COURT:  What's that?
22               THE PLAINTIFF:  The MCAT?
23               THE COURT:  Right.
24               THE PLAINTIFF:  It's a very different exam than the
25   USMLE.  The MCAT gives you a -- I forget what it's called -- a
```

1    passage and then several questions on the passage.  I studied

2    with Kaplan.  Kaplan showed me how to take the MCAT without

3    having to read the full passage.  All you do is map out the

4    passage based on the first sentence of every paragraph, then

5    you read the question, you know exactly where the answer to

6    that question is, you look quickly, and answer the question.

7             THE COURT:  Okay.

8             THE PLAINTIFF:  But NBME or USMLE is a long passage

9    and then a question.  There's 40 of them per section, eight

10   sections.

11            THE COURT:  Okay.

12            MR. GOLDBERG:  Your Honor, having looked at it now

13   this is what I would say.  DSM-5 says -- 5, not the 4. DSM-5

14   says you're supposed to rely upon clinical analysis and

15   clinical analysis is every bit as important as objective

16   testing, and that's what the people at the University of

17   Georgia did.  That's not what this gentleman did.

18            THE COURT:  Well, this gentleman certainly didn't

19   interview her or talk to her.  There's no question about that.

20            MR. GOLDBERG:  No, I agree.  Of course he could not

21   have, okay.  I'm not saying that he should have, but what I am

22   saying is that that's not the same thing as completely

23   discounting the nonobjective analysis that the University of

24   Georgia did.

25            THE COURT:  Right.  And what I'm trying to do is

```
1    look at all the evidence here that has been presented to the

2    Court and that's what I -- I've already talked about the

3    standards.

4              Okay, now I don't think I have anymore questions for

5    her.

6              When actually is this exam?  Is it Thursday or is it

7    Wednesday?  What's the date of the exam?

8              THE PLAINTIFF:  The twenty-fourth, but I can sign up

9    for the 28th if I need to.

10             THE COURT:  Okay.

11             MR. GILLIS:  I may have misstated that, Your Honor,

12   I apologize.

13             THE COURT:  All right.  I mean, you talked about

14   some of these mechanical problems.

15             MR. GILLIS:  Yes, Your Honor.

16             THE COURT:  Now, I'm ready for her to come sit back

17   down, but if there is anything that either one of you would

18   like to ask her go right ahead.

19             MR. GOLDBERG:  No, Your Honor.

20             THE COURT:  And I've liberally let her respond to

21   these issues as they come up and I also let y'all respond.

22   So, thank you very much.  You may have a seat back there.

23             THE PLAINTIFF:  Thank you.

24             THE COURT:  I'm not really sure that anything has

25   changed about this since I read all this material.  It's
```

1    basically what I thought it was going to be when I came in

2    here.  And I think that -- I'll be happy to --

3          Tell you what, we've been going now for quite a

4    while.  Let's take a short break.  About a five or ten minute

5    break and we'll come back.

6      (Recess at 4:48 PM)

7      (Resume at 5:08 PM)

8          THE COURT:  At the beginning of this when I went

9    through and talked about the elements for proving a TRO I said

10   that I thought that basically the substantial likelihood of

11   success on the merits was one question and the irreparable

12   harm was really others and that three and four didn't really

13   count for much.  But Mr. Gillis, you said that you thought

14   there was a failure on all four.  So I'm going to give you the

15   opportunity to tell me why there is a failure on three, that

16   threat and injury must outweigh the harm that the TRO will

17   cause to the nonmoving party.

18         MR. GILLIS:  Yes, Your Honor.  In their brief they

19   made no effort to balance the harms.  Testing accommodations

20   are provided by my client, but they deny those accommodations

21   when the applicant has not established a disability.  And the

22   balance of harm -- the progress of the test, to make sure the

23   test scores are valid is -- what the Court pointed out when we

24   were talking about whether or not this ADHD diagnosis is

25   abused.  The idea is that there is a balance here in the

```
1   equities of the test being fair and fairly administered.
2             I think that's under -- there is a Rothberg case out
3   of the Tenth Circuit and I think that -- it's in our brief,
4   Your Honor -- I think that's -- it's at least where -- it is
5   at least neutral, that she has not, at least, proven that the
6   equities tip in her favor.
7             THE COURT:  Well, to me it seems like the threatened
8   injury is the inconvenience as opposed to some kind of global
9   or national problem.  I understand what you're saying, but
10  that's not the way I think about this component of the TRO
11  elements.  Do you understand what I mean by that?
12            MR. GILLIS:  I do understand, Your Honor.
13            THE COURT:  Yeah.  And you pointed out at the
14  beginning that there were some mechanical problems with this.
15            MR. GILLIS:  Yes, Your Honor.
16            THE COURT:  And so that's really what seems to me
17  the problem is.
18            I understand why the National Board of Medical
19  Examiners would challenge something like this, and I
20  understand why they would say that the integrity of the test
21  and the results could be affected if they let people take this
22  test who didn't have a legitimate ADA impairment.  And all
23  that makes very good sense to me, and I understand the
24  societal background for this.  But that becomes remote in my
25  mind, assuming that there is a decision made that there is a
```

```
1   substantial likelihood of success on the merits, which in this
2   particular case means that there's a finding that she has a
3   disability under the ADA, that she is likely to prevail on
4   that.  Do you agree with what I just said?
5             MR. GILLIS:  Yes, Your Honor.
6             THE COURT:  Do you agree with what I just said?
7             MR. GOLDBERG:  I do, Your Honor.
8             THE COURT:  And so the next one is number four, the
9   TRO must not be adverse to the public interest.
10            MR. GILLIS:  There are two concerns here.  One, I've
11  already addressed to the Court, the integrity of the test.
12  The second one is, this is a minimum competency exam for
13  medical doctors.
14            THE COURT:  Right.
15            MR. GILLIS:  And if that test is violated that's the
16  issue there in the public interest is having, at least,
17  minimally competent doctors as based on the exam.
18            THE COURT:  Okay.  That's an interesting argument.
19  Do you want to respond to that?
20            MR. GOLDBERG:  Your Honor, I would think the public
21  has an interest in preventing all kinds of discrimination and
22  that that interest in preventing discrimination outweighs
23  their interest.  And I might add --
24            THE COURT:  Well, the discrimination is not the
25  issue.  The issue is the delivery of good medical care by
```

1    someone who is not necessarily competent to handle this.

2            MR. GOLDBERG:  Your Honor, if, in fact, this was the

3    last door that my client had to go through and she was going

4    to be let loose on the road incompetent -- perhaps.  But she

5    also has to take --

6            THE COURT:  All of the doors have to be gone

7    through.  It's not just the last door that has to be gone

8    through.  All the doors have to be gone through.

9            MR. GOLDBERG:  Your Honor, I would think that if, in

10   fact, she was able to go through Step 3, and if the fact she

11   was able to go through the medical boards to become a doctor,

12   that that would certainly weed out anybody who wasn't

13   qualified to become a doctor.  I find it hard to believe that

14   this is the last thing standing between me and my medical

15   care.  I just can't believe it.

16           THE COURT:  Well, I can understand that.  Whether

17   that's significant enough in this -- whether that is --

18   whether we can make a prediction about that though is a

19   different matter.  I can certainly think of certain medical

20   specialties that -- what I have heard today this could be a

21   problem for her.

22           So, now, what we're left with is substantial

23   likelihood of success on the merits.  You know, this always

24   comes up and -- most of the time what we have when we have a

25   TRO -- especially since 2007 -- has been situations in which

```
1    its a mortgage, it's a condemnation case, and that's how these

2    usually come up.  And so this is an unusual situation, which

3    is fine.  I certainly don't have any problem with it being

4    unusual, I deal with unusual all the time.

5              But I just have a practical question.  How is

6    substantial likelihood of success on the merits determined?

7    In other words, is that if this case were tried before a judge

8    or is that for a jury?  How do I analyze that?

9              MR. GOLDBERG:  Well, Your Honor, I wish that was an

10   easy question to answer.  I think I would say this, as I dove

11   through Wright and Miller this weekend, they used the term

12   prima facie case.  And then they said that most circuits, even

13   though they don't use that term, are applying that test.

14             Now, I'm not going to tell you I found a case in the

15   Eleventh Circuit that used that term because I didn't.

16             THE COURT:  You didn't, you're right.

17             MR. GOLDBERG:  I think it gets back to that sliding

18   scale.

19             THE COURT:  Well I'm not convinced that sliding

20   scale is the law either.  You haven't convinced me about that

21   either.

22             MR. GOLDBERG:  Your Honor, I simply say that the

23   Texas versus Seatrain International case has not been

24   reversed.

25             THE COURT:  That's an old Fifth Circuit case.  Is
```

1    that what it is?

2            MR. GOLDBERG:  Right.  And normally it comes with

3    one of those foot notes that these cases are controlling and

4    they say see Bonner versus so-and-so.

5            THE COURT:  I know.  I'm familiar with that.

6            MR. GOLDBERG:  Yeah, Your Honor, I don't think that

7    law is not good anymore.  But I think the answer is, you know,

8    you need to make -- well, Your Honor, it's really hard because

9    when you read these cases most of them actually come down to

10   summary judgment.  And I cited any number of cases where, for

11   example, summary judgment was denied and the Court said it was

12   up to the jury to make that determination.

13           The *Pinckney* case is the one that comes to mind

14   immediately from Judge Ward about ten years ago.  I think

15   you've got to make the best determination you can make about

16   whether or not there is any kind of probability.  And I think

17   probability in this case is the 51 percent.

18           THE COURT:  Well, I don't know that preponderance of

19   the evidence standard applies either -- that a substantial

20   likelihood of success on the merits?

21           MR. GOLDBERG:  Well, Your Honor, I would simply say

22   as I understand the term prima facie case, probability is a

23   lot hirer than prima facie case.

24           So I mean I'm --

25           THE COURT:  Prima Facie case just means that you can

```
 1   make out the elements.  It doesn't mean that you succeed on

 2   the elements.

 3          MR. GOLDBERG:  Well, you know, Your Honor, I looked

 4   at that from Wright and Miller and I wondered the same thing.

 5   But then Mr. Wright is dead and Mr. Miller is more famous than

 6   I am so I thought, well, maybe he's right.  But I still

 7   couldn't find an Eleventh Circuit case that said that.

 8          THE COURT:  Right.

 9          MR. GOLDBERG:  I don't think we need to prove beyond

10   a shadow of a doubt.

11          THE COURT:  I agree with that.

12          MR. GOLDBERG:  And I think if you look -- you make

13   your best bet as to who is going to win.  I don't know how

14   else to put it.  I realize that's --

15          THE COURT:  Let me ask Mr. Gillis, what Mr. Gillis

16   thinks about that?

17          MR. GILLIS:  Your Honor, I think in this case and

18   all cases of a TRO you're talking about upsetting the status

19   quo.  And so to upset the status quo has to have a heightened

20   burden on the Plaintiff, a substantial likelihood of success.

21   The word substantial has to mean something and likelihood has

22   to mean something.

23          THE COURT:  Right.

24          MR. GILLIS:  In here, this case is built --

25   Plaintiff's case is built on her comparison as to her peers
```

```
1   and not to the general population.

2            THE COURT:  Right.  I understand.

3            MR. GILLIS:  And I think when this Court compares

4   her to the general population she cannot meet her burden of

5   substantial likelihood of success.  And that's where I think

6   it falls.

7            THE COURT:  Well, I understand that that is the

8   heart of your argument, and I think that's your best argument.

9   That's certainly what I understood from the brief that I

10  thought was a very good brief.

11           Anything further?

12           MR. GOLDBERG:  Your Honor, yes, I think there are a

13  few things further.  Your Honor, I realize you have been here

14  a long time and I appreciate your patience, for one of a

15  better word.

16           The ADA and its regulations are supposed to be read

17  liberally.

18           THE COURT:  I understand.

19           MR. GOLDBERG:  And as the old Fifth Circuit said

20  that means that you strain to provide the remedy and not to

21  avoid it.

22           The Eleventh Circuit -- that's what Starks said,

23  Your Honor, and Starks was affirmed by the Fifth Circuit.

24  It's an old truth in lending case.

25           The regulations are also supposed to be looked at.
```

1   And I think if you look at the regulations, which talk about

2   the idea, that substantially limited is not supposed to be a

3   known or a standard.

4           Your Honor, there is one thing I did want to mention

5   because I think I missed it in the beginning.  The DSM pointed

6   out about 12 years old is not that you have to have the

7   diagnosis by 12 but you have to have the proof of the symptoms

8   before 12, and I think that's what she has.  And I think if

9   you go look at the Decatur school documents you'll see that

10  they note that there is an ADHD diagnosis and there is a

11  psychologist who would never have said that unless there was

12  some kind of doctor's report.

13          Now, have I seen the doctor's report?  I have not.

14  But, Your Honor, I think given the fact that it is supposed to

15  be read liberally I think that counts for something, given the

16  fact that this comes after the amendments to the ADA.

17          I mean, if you look at basically most of the cases,

18  not all the cases -- I'm not going to say all because there

19  are one or two that are after the amendments that they cite.

20  All of them, including *Rothman*, are prior to the amendments.

21  And what the amendments did was they said that we are going to

22  wipe out Supreme Court precedent that we don't like and they

23  specifically overruled *Sutton* and they specifically overruled

24  the *Toyota* case, and the house committee specifically noted

25  about a number of these testing cases and they said we're not

```
 1   going to follow them.  And they cited to Wong, and they cited

 2   to a case out of West Virginia, I think Perez is what it's

 3   called.  So that those cases show that they were trying to

 4   make this just as strict on behalf of the applicant as they

 5   possibly could.

 6          Your Honor, I have cited any number of cases in my

 7   reply brief where mandatory injunctions were granted, even

 8   TRO's were granted.  Wright and Miller, again without citing

 9   to the Eleventh Circuit case, point out that there are, in

10   fact, numerous cases where there are TROs that are granted.

11          And I cited one from Judge O'Kelley where he granted

12   a preliminary injunction to a student and allowed her to

13   continue to attend school even though she had been charged

14   with some kind of offense and found guilty of that offense.

15   He found that she hadn't gotten due process and he put her

16   back into school immediately.  But that's all in my reply

17   brief.

18          THE COURT:  Okay.  Do you want to respond to that,

19   Mr. Gillis, to anything that he just said?

20          MR. GILLIS:  Your Honor, I would like to respond at

21   the end.

22          THE COURT:  This is the end.

23          MR. GILLIS:  This is the end.  Then I'll respond.

24          Here's the thing.  You asked about substantial

25   likelihood of success.  There's no objective test that says
```

1    she has ADHD.  A diagnosis is not a disability.  The Act as
2    amended does not remove the bar of a substantial limitation in
3    a major life activity.  It does not remove that bar and she
4    has to prove that to win her case.
5           Her own doctor says she has no learning disability
6    and she's average on every test.
7           The statement was made that we're not considering
8    the 2015 UGA report.  We are.  And we considered it and had a
9    report done in 2016, but the UGA report in and of itself says
10   she does not have a learning disability.  Her own test scores
11   on the MCAT, the GRE, the Step 1, Step 2 CS without
12   accommodation show that she can pass these exams.  These are
13   hard test.  You heard testimony from the Plaintiff that she
14   has to think about the answers.  Every test-taker has to think
15   about the answers and every test-taker would like more time.
16   That's the purpose of the exam, and that's the integrity of
17   the exam.
18          She hasn't met her extraordinary burden for the TRO.
19   And again, the substantial limitation, the language to confirm
20   that someone has a disability under the Act was not removed in
21   the 2008 amendment.
22          THE COURT:  Anything further?
23          Well, this is what we are going to do.  I went back
24   there at the break and read the DSM-5 elements of proof for --
25   not elements of proof, but you have to have six of those

1    characteristics -- and after I read those -- and what was

2    interesting about that is that I didn't find much evidence for

3    a lot of those, quite frankly, from everything that I have

4    read and everything that I have heard.

5           You've really kind of hinged your case on that.  I

6    don't think the ADA requires that there be a diagnosis of ADHD

7    here in order for there to be some kind of disability.  I

8    don't think that that has to be established.

9           I think that probably what has been established here

10   is that for whatever the reason may be, and that is allusive,

11   but the facts of the case, the history of the case, her

12   testimony, her explanation for how she succeeded on these

13   tests like the MCAT, for example, and the GRE and all that,

14   the fact that she did get the accommodations back in -- and I

15   think it was 1999 when she was in the 11th grade -- the fact

16   that she has gotten all of these accommodations all this time

17   through Georgia Tech and at Emory, and the fact that what she

18   got over the course of that time -- that what she got over the

19   course of that time is essentially what she's asking for here,

20   I'm going to find that the motion should be granted.

21          So I certainly understand why the Defendant in this

22   case would be concerned about this.  I certainly think that

23   the Defendant in this case ought to be fighting these when

24   they think that they are suspicious.  I don't have any problem

25   with that at all.  But under the circumstances of what I have

```
1    heard I think there is a likelihood of success.
2              If this was to go before a jury, for example, I
3    don't think the jury would have any trouble at all in deciding
4    that this woman needed an accommodation.
5              So I'm going to grant that.
6              Now what does that mean for purposes of how she's
7    going to take the exam?
8              MR. GOLDBERG:  I assume that I'm going to have to
9    sit down with Defendant's attorneys and figure that out by
10   tomorrow.
11             THE COURT:  Okay.
12             MR. GOLDBERG:  But it certainly is going to include
13   one and a half times and it's certainly going to include a
14   quiet room.
15             THE COURT:  Right.  I understand.  She also asked
16   for written directions.  I don't know how the directions come.
17             THE PLAINTIFF:  They are already written.
18             MR. GOLDBERG:  Your Honor, I believe they are
19   already written.  I think that counsel and I can get those
20   things and I think we'll get them done.
21             THE COURT:  All right.  Very good.
22             Anything further about this?  Any questions that you
23   have about what I have done or why I did what I did?
24             I think this is a very difficult case quite frankly.
25   All right.
```

1           MR. GOLDBERG:  Thank you, Your Honor.

2           CSO OFFICER:  All rise.  Court is adjourned.

3

4                 (Proceedings concluded at 5:27 P.M.)

5                      END OF RECORD

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3        I, Tammy W. DiRocco, Federal Official Court Reporter, in

4   and for the United States District Court for the Middle

5   District of Georgia, do hereby certify that pursuant to

6   Section 753, Title 28, United States Code, that the foregoing

7   is a true and correct transcript of the stenographically

8   reported proceedings held in the above-entitled matter and

9   that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12                           Dated this 25th day of May, 2018

13

14

15   _____

16   Tammy W. DiRocco CCR
     Federal Official Court Reporter

17

18

19

20

21

22

23

24

25
```